THOMAS S. McCONNELL (Bar No. 132932)
SAMANTHA L. CHEN (Bar No. 307155)
MILLER STARR REGALIA
A Professional Law Corporation
1331 N. California Blvd., Suite 600
Walnut Creek, California 94596
Telephone:    925 935 9400
Facsimile:    925 933 4126
Email:    thomas.mcconnell@msrlegal.com
          samantha.chen@msrlegal.com

Attorneys for Plaintiff CVS PHARMACY, INC.,
a Rhode Island corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| CVS PHARMACY, INC., a Rhode Island corporation,<br><br>        Plaintiff,<br><br>v.<br><br>SWYFT, INC., a Delaware corporation; SWYFT CAPITAL; and DOES 1-20, inclusive,<br><br>        Defendants. | Case No.<br><br>COMPLAINT FOR:<br><br>1) BREACH OF SETTLEMENT AGREEMENT<br>2) BREACH OF MASTER RENTAL AND SERVICES AGREEMENT<br>3) FALSE ASSOCIATION/ FALSE DESIGNATION OF ORIGIN (LANHAM ACT 15 U.S.C. § 1125(a))<br>4) UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200)<br>5) FALSE ADVERTISING (CAL. BUS. & PROF. CODE § 17500) |

Plaintiff CVS PHARMACY, INC. ("CVS" or "Plaintiff") complains against defendants, and each of them, as follows:

1.    CVS is, and at all relevant times was, a corporation duly organized and existing under the laws of the State of Rhode Island, with its principal place of business in Rhode Island, and therefore is a citizen of Rhode Island for purposes of 28 U.S.C. § 1332. Further, CVS is authorized to do business in California.

2.    CVS is informed and believes, and based thereon alleges, that defendant SWYFT, INC. ("Swyft, Inc.") is, and at all relevant times was, a corporation organized under the laws of the State of Delaware, with its principal place of business in San Francisco, California, and

therefore is a citizen of Delaware and California for purposes of 28 U.S.C. § 1332. Further, Swyft, Inc. is registered to do business in the State of California.

3.     CVS is informed and believes, and based thereon alleges, that defendant SWYFT CAPITAL ("Swyft Capital") is, and at all relevant times was, a business entity affiliated with Swyft, Inc., that executed the settlement agreement at issue in this matter and is identified therein as a subsidiary of Swyft, Inc. Swyft Capital is jointly and severally liable for the obligations alleged herein. Swyft, Inc. and Swyft Capital are hereinafter collectively referred to as "Defendants" or "Swyft."

4.     Plaintiff is unaware of the true names and capacities of Defendants sued herein as DOES 1 through 20, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will seek leave of this Court to amend this Complaint to allege their true names and capacities when they have been ascertained.

5.     At all times herein mentioned, each of the Defendants, including the Defendants served herein as DOES 1 through 20, inclusive, was a principal, agent and/or employee of each of the remaining Defendants, and in so doing the things herein mentioned, was acting as such principal, or within the scope of such agency and/or employment, by reason of which these Defendants are liable to Plaintiff.

<u>Jurisdiction and Venue</u>

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because CVS asserts claims arising under the Lanham Act, 15 U.S.C. § 1125(a). The Court also has supplemental jurisdiction over CVS's related state-law claims pursuant to 28 U.S.C. § 1367. This Court further has jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.     This Court has personal jurisdiction over Defendants because Swyft, Inc. is headquartered in this District, conducts substantial business in this District, and the acts and omissions giving rise to Plaintiff's claims occurred in this District.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because Swyft, Inc. resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

Divisional Assignment

9.     This action is properly assigned to the San Francisco Division of this District pursuant to Civil Local Rule 3-2(c) and (d) because a substantial part of the events and omissions giving rise to the claims occurred in San Francisco County, California, and Swyft, Inc. maintains its principal place of business in San Francisco, California. Divisional assignment to the San Francisco Division is therefore appropriate.

The Parties' Business Relationship

10.     On or about October 25, 2018, CVS and Swyft entered into a written Master Rental and Services Agreement (the "Master Agreement") pursuant to which Defendants agreed to provide and operate automated retail machine kiosks for the sale of CVS-branded products. A true and correct copy of the Master Agreement is attached hereto as **Exhibit "A"** and is incorporated herein by this reference.

11.     As part of the parties' relationship and under the Master Agreement, CVS developed and supplied wrap designs for Swyft's kiosks which were distinctive to CVS, including color schemes, graphics, and iconography specific to CVS (the "Wrap Artwork"). CVS furnished those designs to Swyft solely for use on kiosks operated under the parties' business relationship.

12.      Section 18(d) of the Master Agreement provides that materials furnished by CVS, including designs and related materials, remain the property of CVS and must be returned promptly upon request.

Settlement Agreement

13.     A dispute arose between the parties relating to their respective rights and obligations pursuant to the Master Agreement which ultimately resulted in the parties entering into a Settlement Agreement and Limited Release of Claims (the "Settlement Agreement") on or about October 17, 2022.  A true and correct copy of the Settlement Agreement is attached hereto as **Exhibit "B"** and is incorporated herein by this reference.

14. Pursuant to the terms of the Settlement Agreement, Swyft agreed to pay CVS a total of $1,800,000.00 (the "Settlement Amount") pursuant to a payment schedule outlined in Section 1 of the Settlement Agreement.

15. In particular, Swyft agreed to pay CVS $600,000.00 within seven (7) days of Swyft's anticipated closing of its Series A-2 financing round.

16. The Settlement Agreement further provides that, so long as Swyft paid the initial $600,000.00 installment by January 4, 2023, Swyft would be required to pay the remaining $1,200,000.00 of the Settlement Amount in equal monthly installments of $33,333 through March 5, 2024, with any remaining unpaid balance due and payable in full no later than April 5, 2024.

17. The Settlement Agreement further provides, in Section 2, that if any Settlement Payment is not paid on or before the date due, the full remaining unpaid balance of the Settlement Amount shall immediately accelerate and become due and payable to CVS within five (5) days of such default, together with daily compound interest at the rate of 0.05% on the full amount owing until paid. The Settlement Agreement also provides that CVS is not required to provide notice of default for these terms to take effect.

<u>Swyft's Breach of the Settlement Agreement</u>

18. Swyft paid the initial $600,000 installment timely and thereafter made monthly payments of approximately $33,333 for a certain period of time.

19. Pursuant to Section 1 of the Settlement Agreement, Swyft was required to pay the remaining unpaid balance of the Settlement Amount in full as a final "balloon payment" no later than April 5, 2024. Swyft failed to make that balloon payment when due.

20. Swyft's failure to make the balloon payment on or before April 5, 2024 constituted a material breach and event of default under the Settlement Agreement, triggering the acceleration provisions in Section 2.

21. Swyft continued to make the monthly payments of $33,000 for a period of time thereafter. CVS at no time agreed to modify the Settlement Agreement or to waive Swyft's default or CVS's contractual right to demand immediate payment of the full accelerated balance.

22.    On or about May 2025, Swyft ceased making any further payments altogether to CVS pursuant to the Settlement Agreement. Swyft has failed and refused, and continues to fail and refuse, to pay the accelerated balance owing despite its clear contractual obligation to do so.

23.    Since Swyft made the $600,000 initial payment, and approximately 28 monthly installment payments of about $33,000 each from early 2023 until around May 2025, totaling approximately $924,000, this left an unpaid principal balance outstanding and owing to CVS pursuant to the Settlement Agreement in an amount no less than $276,000.

24.    As a result of Swyft's defaults and the resulting acceleration of the remaining balance of the Settlement Amount, $276,000 in unpaid principal is now immediately due and owing by Swyft to CVS, exclusive of accrued interest at the contractually agreed rate.

25.    Between at least July and December 2025, through its counsel and various executives by email and other communications, CVS repeatedly demanded that Swyft pay the overdue, outstanding balance of the Settlement Amount.  Swyft, however, failed to substantively respond to these demands and/or cure its default under the Settlement Agreement.

<u>CVS's Resulting Damages</u>

26.    Despite CVS's numerous reminders to Swyft that it was in breach of its payment obligations pursuant to the Settlement Agreement, Swyft continues to fail and refuse to cure its outstanding breaches of the Settlement Agreement or to pay CVS the balance of the Settlement Amount now past due and owing.  CVS is further informed and believes, and based thereon alleges, that Swyft has no intention of complying with its remaining obligations pursuant to the Settlement Agreement unless and until ordered to do so.

27.    CVS has performed and fulfilled all its duties and obligations under the terms of the Settlement Agreement and at all relevant times herein, Swyft knew that CVS had performed and fulfilled all of those duties and obligations.

28.    Swyft, on the other hand, has materially breached the Settlement Agreement by failing and refusing to pay CVS the remaining balance due and owing pursuant to the

Settlement Agreement in the amount of no less than $276,000, plus contractually agreed interest, costs, and related relief.

29.    As a direct and proximate result of Swyft's material breaches of the Settlement Agreement, CVS has suffered, and continues to suffer, damage, harm and loss, as well as pre-judgment interest thereon, in an amount to be established at trial.

<u>Swyft's Unauthorized Use of CVS Kiosk Wrap Design</u>

30.    Swyft's authority to use the Wrap Artwork was limited. Swyft was not authorized to use the Wrap Artwork except in connection with kiosks operated for CVS pursuant to the parties' relationship, and CVS did not authorize Swyft to continue using the Wrap Artwork on kiosks operating outside that relationship or in locations not approved by CVS.

31.    On or about March 28, 2025, CVS sent Swyft written correspondence that the wrap design was CVS's design, that Swyft's continued use of that design was not authorized, and that CVS demanded that Swyft cease using the wraps. CVS further confirmed in that communication that the parties' remaining kiosk arrangements would terminate effective July 1, 2025.

32.    Thereafter, solely in connection with offboarding discussions, CVS temporarily agreed, solely to avoid the cost and disruption of immediate removal, that certain existing kiosks could retain CVS wraps while decommissioning was underway. CVS expressly prohibited Swyft from moving any kiosk bearing Wrap Artwork to any new or higher-visibility locations, or using Wrap Artwork on any new kiosks or in any new locations.

33.    Notwithstanding CVS's express limitations and the termination of the parties' relationship, and since the full decommissioning has been effected, Swyft has continued to display Wrap Artwork on kiosks that were moved or placed in new and high-traffic venues without CVS's authorization, including numerous airport locations, among others.

34.    CVS has received reports and photographic evidence of such kiosks bearing the Wrap Artwork in the marketplace, causing confusion among CVS employees and members of the public as to whether Swyft's kiosks remain affiliated with or approved by CVS.

CVPH-58734\3296576.1                                    -6-                                    Case No.
COMPLAINT FOR BREACH OF SETTLEMENT AGREEMENT

35. From at least July through September 2025, CVS repeatedly demanded that Swyft remove CVS Wrap Artwork from non-compliant kiosks and complete de-branding, including by means of multiple written communications. Swyft has failed to timely do so and has refused to confirm that it will cease such use or remove CVS branding from non-compliant kiosks, despite CVS's repeated demands that it do so.

## FIRST CAUSE OF ACTION

### (<u>Breach of Settlement Agreement –Against All Defendants</u>)

36. CVS realleges paragraphs 1 through 35 as though fully set forth herein.

37. The Settlement Agreement is a valid and enforceable contract.

38. CVS has performed all conditions, covenants, and obligations required of it under the Settlement Agreement, except those excused by Swyft's breaches.

39. Swyft materially breached the Settlement Agreement by, among other things:

    (a) failing to make the final balloon payment due on April 5, 2024;

    (b) failing to pay the accelerated balance owing pursuant to the Settlement Agreement after its default of the Settlement Agreement; and

    (c) thereafter ceasing all payments under the Settlement Agreement despite CVS's repeated demands for payment.

40. As a direct and proximate result of Swyft's breaches, CVS has been damaged in an amount no less than $276,000 in unpaid principal, plus daily compound interest at the contract rate, costs, and such additional damages as may be proven at trial.

WHEREFORE, CVS prays for judgment against Defendants, and each of them, as hereinafter set forth.

## SECOND CAUSE OF ACTION

### (<u>Breach of Master Rental and Services Agreement – Against All Defendants</u>)

41. CVS realleges paragraphs 1 through 40 as though fully set forth herein.

42. The Master Agreement is a valid and enforceable contract.

43. CVS has performed all conditions, covenants, and obligations required of it under the Master Agreement, except those excused by Swyft's breaches.

44. Section 18(d) of the Master Agreement provides that materials furnished by CVS to Swyft, including documents, drawings, models, sketches, and designs relating to CVS, remain the property of CVS and must be returned promptly upon request.

45. CVS furnished the Wrap Artwork to Swyft in connection with the parties' performance under the Master Agreement.

46. After termination of the parties' relationship, CVS demanded that Swyft cease using the CVS-designed wraps and return CVS's materials in accordance with Section 18(d) of the Master Agreement.

47. Swyft has failed and refused, and continues to fail and refuse, to comply with CVS's demand and continues to use the Wrap Artwork on kiosks.

48. Swyft's continued use of CVS's Wrap Artwork and failure to return CVS's materials constitute material breaches of the Master Agreement.

49. As a direct and proximate result of Swyft's unlawful conduct, CVS has suffered irreparable injury to its goodwill and reputation, and there is no adequate remedy at law, absent injunctive relief.

50. CVS has been damaged and is entitled to injunctive relief and such other relief as permitted by law.

WHEREFORE, CVS prays for judgment against Defendants, and each of them, as hereinafter set forth.

**THIRD CAUSE OF ACTION**

(**False Designation of Origin/ False Association  – Lanham Act, 15 U.S.C. §1125(a) – Against All Defendants**)

51. CVS realleges and incorporates by reference paragraphs 1 through 50 as though fully set forth herein.

52. CVS is the owner of and has a commercial interest in distinctive trade dress and branding associated with its kiosk design, which CVS uses in commerce and which consumers associate with CVS.

53. Without CVS's authorization, Swyft has used and continues to use in commerce CVS's Wrap Artwork and associated trade dress in connection with the advertising, promotion, offering for sale, and operation of automated retail kiosks and related goods and services.

54. Swyft's unauthorized use of the Wrap Artwork is misleading and likely to cause, and has caused, confusion, mistake and deception among consumers as to the affiliation, connection, sponsorship, or approval of Swyft's kiosks by CVS, or association with CVS generally, and as to the origin or approval of Swyft's goods and services.

55. Swyft's acts constitute false designation of origin, false association, and unfair competition in violation of 15 U.S.C. § 1125(a).

56. As a direct and proximate result of Swyft's unlawful conduct, CVS has suffered irreparable injury to its goodwill and reputation, and there is no adequate remedy at law, absent injunctive relief.

57. CVS has been damaged and is entitled to injunctive relief, damages, and such other relief as permitted by law.

WHEREFORE, CVS prays for judgment against Defendants, and each of them, as hereinafter set forth.

### FOURTH CAUSE OF ACTION

### (Unfair Competition – Cal. Bus. & Prof. Code § 17200 – Against All Defendants)

58. CVS realleges and incorporates by reference paragraphs 1 through 57 as though fully set forth herein.

59. Swyft has engaged in unlawful, unfair, and fraudulent business acts and practices within the meaning of California Business and Professions Code § 17200 et seq., including, without limitation, by misappropriating and using the Wrap Artwork without

authorization, falsely suggesting an affiliation with CVS, and continuing such conduct after termination of the parties' business relationship and repeated demands to cease.

60.    Swyft's acts constitute "unlawful" business practices because they violate the Lanham Act, 15 U.S.C. § 1125(a), and constitute "unfair" and "fraudulent" practices because they are likely to deceive reasonable members of the public as to the source, sponsorship, affiliation, or approval of Swyft's kiosks and goods.

61.    Swyft's conduct is likely to cause confusion among an appreciable number of reasonable consumers and has caused actual confusion as to whether Defendants' kiosks are affiliated with, sponsored by, or approved by CVS.

62.    As a direct and proximate result of Swyft's unfair competition, CVS has suffered injury in fact, and damage to CVS's goodwill and brand.

63.    Swyft has been unjustly enriched by their unlawful conduct and have obtained revenues and other benefits to which they are not entitled.

64.    Pursuant to California Business and Professions Code § 17203, CVS seeks injunctive relief prohibiting Swyft from engaging in such unfair competition and restitution of all monies wrongfully obtained by Defendants as a result of their conduct.

WHEREFORE, CVS prays for judgment against Defendants, and each of them, as hereinafter set forth.

**FIFTH CAUSE OF ACTION**

**(False Advertising – Cal. Bus. & Prof. Code § 17500 – Against All Defendants)**

65.    CVS realleges and incorporates by reference paragraphs 1 through 64 as though fully set forth herein.

66.    Swyft has disseminated, and continues to make and disseminate, misleading representations to the public in connection with the advertising and sale of goods and services through their kiosks by using the Wrap Artwork and overall presentation in a manner that conveys CVS sponsorship, affiliation, or approval when no such relationship exists.

67.    These representations are untrue and misleading, and Defendants knew or should have known they were misleading, particularly after CVS's written demands to cease and

CVPH-58734\3296576.1                           -10-                           Case No.
COMPLAINT FOR BREACH OF SETTLEMENT AGREEMENT

remove the Wrap Artwork, and with the intent to induce the public to use Swyft's kiosks and buy Swyft's goods.

68.    Swyft's misleading advertising is likely to deceive members of the public and has caused confusion regarding affiliation and approval of Swyft's kiosks and goods.

69.    As a direct and proximate result of Swyft's false and misleading advertising, CVS has suffered injury in fact, and damage to CVS's goodwill and brand.

70.    Swyft's acts constitute false and misleading advertising in violation of California Business and Professions Code § 17500, entitling CVS to injunctive relief, statutory fines, and such other relief as the Court deems proper.

WHEREFORE, CVS prays for judgment against Defendants, and each of them, as follows:

1.    For damages in the amount to be determined at trial of at least the principal amount of $276,000;

2.    For prejudgment interest, including, but not limited to, daily compound interest at 0.05% on the full amount owing as provided in the Settlement Agreement;

3.    For costs of suit, expenses, and attorneys' fees as provided by law and incurred in this action;

4.    For disgorgement of Defendants' profits;

5.    For preliminary and permanent injunctive relief enjoining Defendants from reproducing, displaying, distributing, or otherwise using the Wrap Artwork and any confusingly similar trade dress, and from otherwise falsely suggesting affiliation with CVS;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

6.      For restitution and injunctive relief under Cal. Bus. & Prof. Code § 17203, and injunctive relief and other remedies available under Cal. Bus. & Prof. Code § 17500; and

7.      For such other and further relief as this Court deems just and proper.

Dated:  March 24, 2026                    MILLER STARR REGALIA


                                        By:   */s/ Thomas S. McConnell*
                                              THOMAS S. McCONNELL
                                              SAMANTHA L. CHEN
                                              Attorneys for Plaintiff CVS PHARMACY, INC., a
                                              Rhode Island corporation

# EXHIBIT "A"

BDJ\99999\859255.1

DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

**swyft**

<u>MASTER RENTAL AND SERVICES AGREEMENT</u>

This Master Rental and Services Agreement ("Agreement") is made as of October 25th, 2018, (the "Effective Date") by and between Swyft Capital, a Delaware corporation having its principal place of business at 140 Geary St, Floor 7, San Francisco CA 94108 ("Swyft") and CVS Pharmacy, Inc., a Rhode Island corporation, on its own behalf and on behalf of its subsidiaries and affiliates, including without limitation Caremark Rx, L.L.C., with an office located at One CVS Drive, Woonsocket, RI 02895 ("Brand Partner").

<u>BACKGROUND</u>

WHEREAS, Brand Partner is in the business of manufacturing and/or retailing of consumer goods;

WHEREAS, Swyft is in the business of, among other things, (1) developing and maintaining software and hardware systems for automated retail, (2) retailing products through automated retail machines, (3) managing Services for the operation of automated retail machines, including maintaining networks of automated retail locations, property leases, handling of inventory, warehousing and logistics, and software and hardware management, among other things, whether provided by Swyft or by its third-party vendors;

WHEREAS, the Parties desire to memorialize the terms and conditions under which Swyft would rent to Brand Partner such automated retail machines and related managed Services which may include Services purchased by Swyft through its third-party vendors and where Swyft may further develop and operate certain retail channels through which Swyft may sell Products obtained from vendors pursuant to the terms outlined in Section 15 Product Supply Chain, Replenishment and Right to sell as well as  Exhibit C Product Recalls and Returns.

NOW, THEREFORE, the parties, in consideration of the covenants contained herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, agree as follows:

<u>AGREEMENT</u>

1. <u>Purchase of SwyftStores: Services</u>

   a. <u>Relationship</u>. Brand Partner acknowledges that, except to the extent the parties may agree otherwise in a written, executed amendment to this Agreement: (i) automated retail machines to be provided hereunder ("SwyftStores"), including hardware components and software components thereof (respectively, "Hardware" and "Software"), will be provided by Swyft and (ii) all associated Services relating to development, deployment and ongoing operation and support of the SwyftStores to be provided hereunder will all be performed by Swyft or its third parties.

   b. <u>Initial SwyftStore Rentals.</u> Contingent upon Swyft's receipt of all required payments in full in accordance with the rental terms outlined in Exhibit A, Swyft agrees to supply the required number of SwyftStores specified by Brand Partner. SwyftStores will be sourced, shipped and installed by Swyft. Fees for the rental fees payable for each of the SwyftStores ("Monthly Fixed Fees" are defined and set forth in Exhibit A). SwyftStores will be shipped FOB from Swyft's warehouse by Swyft's regular carriers. Swyft will be the importer of record for all destinations outside the United States, provided that Brand Partner shall reimburse Swyft for all costs and expenses incurred by Swyft in connection therewith. Brand Partner may in the future rent additional SwyftStores. To do so, Brand Partner will execute a new Schedule provided by Swyft ("Order Form"). As used herein, "Ordered SwyftStores" shall mean any Stores ordered by Brand Partner and/or Swyft pursuant to Exhibit A during the Term of this Agreement. At any point during the Initial Term or at the end of the Initial Term, Brand Partner has the right to purchase the

Swyft Confidential

DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

ordered SwyftStores by payment of the agreed upon residual value, plus the remaining Monthly Fixed Fees for the Initial Term with no prepayment penalty. If Brand Partner chooses to purchase the ordered SwyftStores at any time, Brand Partner must enter into a new agreement for Services with Swyft, unless terminating relationship pursuant to section 5.

c.  <u>Hardware Rental & Warranty.</u> Swyft shall retain ownership of all Hardware and also retain a first lien security interest in all Hardware during the initial rental term and any renewal thereof not purchased in full by Brand Partner. Brand Partner grants to Swyft or its assigns the right to record UCC financing statements reflecting Swyft's ownership interest in the Hardware not purchased in full by Brand Partner until all Hardware has been returned to Swyft at the end of the rental term or any renewal thereof. Swyft warrants that Hardware will remain substantially free from defects in material and workmanship under normal use and service during the Initial Term (as defined in subsection (d) below) for the applicable SwyftStore. Swyft does not warrant that operation of the Hardware will be error-free or uninterrupted. Within the warranty period, Swyft shall supply any necessary replacement parts at its sole cost and expense. Any labor involved with the removal of defective parts and the installation of replacement parts shall be covered by Swyft for so long as the Service Term remains in effect and Brand Partner is current in all payment obligations due to Swyft, and provided the SwyftStore has been installed by Swyft inside the defined geographic area identified in Exhibit A. Some newly manufactured SwyftStores may contain remanufactured/reconditioned parts or components that meet the same quality standards as new parts and components and are covered by the Warranty. The Warranty does not apply to defects in the Hardware caused by: (i) Brand Partner's failure to follow Swyft's written operation or maintenance instructions or procedures; (ii) Brand Partner's mishandling, misuse, negligence, or improper storage of the Hardware; (iii) moving a SwyftStore after its installation unless such move is performed by Swyft; (iv) modifications, servicing or repairs not made by Swyft or its third-party service providers; or (v) power failures, surges, fire, flood, accident, actions of third parties or other events outside Swyft's reasonable control as long as the appropriate precautionary equipment, for example surge protectors are installed. (collectively, the "Exclusions"). The Warranty specified in this paragraph and Swyft's use of reasonable efforts to receive remedies from third parties under such Warranty on behalf of Brand Partner is Brand Partner's sole and exclusive remedy and Swyft's entire liability for defective Hardware and is in lieu of all other warranties, expressed, implied or statutory, including but not limited the implied warranties of merchantability and fitness for a particular purpose.

d.  <u>Services and Service Terms</u>. Swyft will provide Services under this Agreement as detailed in Exhibit B, including Services relating to the ongoing operation and support of the SwyftStores ("Services") for which Brand Partner is charged a monthly fee by Swyft as defined in Exhibit A ("Monthly Fixed Service Fees"), and the other payments that are part of the Monthly Fixed Fees as specified in Exhibit A. The obligations of Brand Partner regarding the Services are set forth in Exhibit B. Each SwyftStore will have an initial five-year term commitment for Services ("Initial Term, commencing on the date that each such SwyftStore is installed unless otherwise noted in Exhibit A. The term will automatically renew for consecutive one-year Terms after the initial term completed on terms no less favorable to Brand Partner however which can include actual increases in Swyft's costs providing that Swyft notifies Brand Partner of such cost increases at least 120 days in advance of the expiration of the Service Term (each, a "Renewal Term") unless Brand Partner provides written notice of non-renewal that is received by Swyft at least ninety (90) days prior to the renewal date. "Service Term" will mean both the Initial Term as well as any Renewal Terms for the applicable SwyftStore. ==In the event Brand Partner wishes to terminate Services for a SwyftStore prior to the end of its Service Term for any reason, then Brand Partner may do so in==

  Swyft Confidential

DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

accordance with Section 5 below. Any such termination by Brand Partner for any reason, or simply for convenience, shall not relieve Brand Partner of its obligation to pay all Monthly Fixed Fees as outlined in section 5 Term and Termination.

    e.    Software License. Swyft's Software is licensed, not sold, to Brand Partner. As part of the SwyftStore Rental Fee, Swyft is granting a non-exclusive, non-transferable, worldwide, royalty free right and license and use the Software (including all upgrades and updates thereto) in connection with the use and operation of each SwyftStore ("License"). The License shall be perpetual so long as Brand Partner performs all of its obligations set forth herein and this Agreement has not been terminated, with exception of Swyft insolvency invoking the transfer of escrowed materials outlined in section 5.d

    f.    Pilot SwyftStores. Swyft and Brand Partner to work in good faith towards identifying pilot channels and limiting Brand Partner's exposure with regards to service fees in these not yet viable channels. Thus, the initial service fee payment of $7.200 for designated Pilot SwyftStore's will be due 90 days post the designated Pilot SwyftStore's successful installation. The Brand Partner will notify Swyft within 90 days if it wishes to terminate the test of the designated Pilot SwyftStore. If the Brand Partner choses to terminate the test, then the Brand Partner assumes any and all responsibility for costs associated with the removal of the designated Pilot SwyftStore outlined in Exhibit A and $1,800 to be applied towards the initial service fee payment.

2.    Fees, Taxes and Payment Terms. Brand Partner agrees to pay all the fees and cost set forth in Exhibit A unless expressly stated otherwise in a written amendment to this Agreement executed by both parties. Brand Partner is responsible for, and all prices are exclusive of, any sales, use, value-added or other taxes, and any tariffs, duties, VAT, fees or other charges, imposed by any governmental authority (collectively, "Taxes") and based on the value or amount of SwyftStores sold or licensed under this Agreement or the Services provided under this Agreement, with the exception of any taxes based on the net income of Swyft. If Swyft has the legal obligation to pay or collect Taxes for which Brand Partner is responsible under this section, the appropriate amount will be invoiced to and paid by Brand Partner unless Brand Partner provides Swyft with a valid tax exemption certificate authorized by the appropriate taxing authority. Notwithstanding the foregoing, Swyft shall be responsible for collecting and submitting all Taxes associated with the sale of Products through the SwyftStores pursuant to the PDA. Fees will be invoiced by Swyft as set forth in Exhibit A. Unless otherwise specified on Exhibit A, payment on all invoices (excluding portions which are disputed in accordance with the following sentence) is due from Brand Partner within thirty (30) days of invoice date. If Brand Partner wishes to dispute any portion of an invoice, Brand Partner must do so in writing prior to the invoice due date and must pay all of the invoice amount, including the disputed portion, by the due date. If any Rental Fee or other amount payable to Swyft is not paid within 30 days of its due date, Brand Partner shall, to the extent permitted by law, pay on demand, as a late charge, an amount equal to the greater of $25.00 or 5% of the amount then due for each 30 days or portion thereof that said overdue payments are not made (but in no event to exceed the highest late charge permitted by applicable law). Brand Partner also agrees to pay any fees assessed for each check or ACH returned unpaid.

3.    Business Permits, Zoning Compliance and Location Lease Agreements. Swyft will assume all responsibility but Brand Partner will cover actual costs associated for acquiring necessary licenses, zoning and permits. Swyft is solely responsible for all Location Lease Agreements for the placement of the SwyftStores. Swyft is solely responsible for any administration of any lease payment, late fees, lease penalties, property damage caused by negligence of Swyft or other penalties associated with infringement of established lease agreements. For example, business permits or licenses range from $10 to $100 in fixed

        Swyft Confidential



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

fees, though some jurisdictions calculate the business license fee as a percentage of sales of revenue from each location.

    a.   BRAND PARTNER acknowledges all costs associated with Location Lease Agreements payments, security deposits, lease prepayments, property tax and permit fees accruing during the term of this Agreement will be passed through to Brand Partner by Swyft.

    b.   All lease terms and other agreements that result in any pass-through payments must be subject to prior approval by Brand Partner. Brand Partner shall have the right to review all Location Lease Agreements payments, permit applications and other site selection documentation associated with the placement of the machines at any time.

    c.   Under no circumstances will Brand Partner be held accountable for lease payments, sales or property tax or business permits and or zoning compliance or any other costs addressed in this section accruing after the expiration of the term of this Agreement

4.   Dispute Resolution. In the event Brand Partner disputes any Rental Fees or other charges, BRAND PARTNER ACKNOWLEDGES AND AGREES THAT ANY CLAIMS IT MAY HAVE AGAINST SWYFT UNDER THE TERMS OF THIS AGREEMENT SHALL BE MADE SOLELY AGAINST SWYFT AND NOT ANY ASSIGNEE OF SWYFT, NOTWITHSTANING ANY CREDITS, OFFSET RIGHTS, OR CANCELLATION RIGHTS THAT MAY BE PROVIDED FOR HEREIN UNDER THIS AGREEMENT. In the event Brand Partner, in good faith, disputes any Rental Fees or any other charges stated in a Swyft invoice, such dispute shall not relieve Brand Partner's obligation to make such payment. However Brand Partner may seek reimbursement from Swyft for all or a portion of any invoice in dispute in the manner provided for herein, provided that, within thirty (30) days of receipt of such invoice, Brand Partner (i) pays all invoiced amounts without any abatement, reduction or set-off.; (ii) notifies Swyft and its assigns in writing of the disputed charges, specifying in detail the disputed amount(s), the specific Brand Partner details pertaining to the disputed amounts and the basis of the dispute; and (iii) uses all reasonable efforts to promptly resolve the dispute. Swyft shall have sixty (60) days from the date of Brand Partner's notification hereunder to provide Brand Partner with Swyft's response in connection with a disputed item. If the Brand Partner fails to provide Swyft with such written notice of the dispute within thirty (30) days of the invoice date, then Swyft shall have no obligation to investigate or reimburse any paid invoices to Brand Partner and the Brand Partner waives any rights to dispute such charges If any such dispute remains unsettled after sixty (60) days, the Parties agree to submit such dispute to a mutually acceptable Registered Mediator located in the State of California with the mediation to be conducted in person or telephonically, and conduct good faith pre-suit mediation prior to filing a complaint in any court.

    a.   Arbitration Required after Negotiation. In the event Brand Partner has a dispute and has followed the procedures set forth above, and such dispute is not resolved between Brand Partner and Swyft within 60 days of the date on which Brand Partner provides to Swyft written notice of such claim, then the provisions of this section shall govern. All disputes (except those related to Rental Fees assigned to the assignee of Swyft, or to intellectual property ownership or licensing and confidentiality matters which shall be litigated ["Exempt Disputes"]) between the Parties arising out of this Agreement will be fully and finally settled (all appeals are hereby waived except errors as to law) by arbitration. As a condition precedent to filing an arbitration, however, both parties must attempt to negotiate in good faith over a period of no shorter than 60 days after written request by one of the Parties.

       Swyft Confidential



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

    b.    U.S. Arbitration. The arbitration shall be according to the Commercial Arbitration Rules of the American Arbitration Association as may be amended from time to time.

    c.    Administrative Matters. The situs of the proceedings shall be San Francisco, California. Any arbitration panel shall consist of three arbitrators with each party selecting one arbitrator and the two then selecting the third to be appointed in accordance with the applicable rules. Any such panel shall consist solely of impartial, independent, and uninterested arbitrators and the third arbitrator may not be a national of either party unless mutually agreed. Any such panel or court shall allocate costs according to the decision but may consider improper conduct when allocating costs. Any such panel shall issue its determination no later than three months after conclusion of the proceedings. The existence of any arbitration, the discovery provided, and award issued shall remain confidential except to the extent necessary to enforce the award or as necessary to pursue any legal rights of either Party.

5.    <u>Term and Termination.</u>

    a.    <u>Agreement Term.</u> The term of this Agreement ("Agreement Term") will commence on the Effective Date and, unless terminated earlier in accordance with subsection (b) or (c) below, will end on the termination of all Service Terms for all SwyftStores.

    b.    Early Termination of this Agreement by Brand Partner for Convenience. Brand Partner may terminate this Agreement for convenience, in whole but not in part, with one hundred eighty (180) days prior written notice to Swyft, provided that upon such termination, Brand Partner shall be obligated for payment of the following fees in full on or before the effective date of termination:

        i.    "<u>Monthly SwyftStore Rental Fees</u>":
            1.    All remaining "Monthly SwyftStore Rental Fees" which would have otherwise been due to Swyft hereunder through the end of the Agreement Term for each SwyftStore (inclusive of any Ordered SwyftStores not yet installed or delivered as of the termination date)

        ii.    "<u>Monthly Fixed Services Fees</u>"
            1.    All remaining "Monthly Fixed Service Fees" which would have otherwise been due to Swyft hereunder through the end of the Agreement Term for each SwyftStore (of any Ordered SwyftStores that have installed and delivered as of the termination date)
            2.    The lesser of 30 months of Fixed Service Fees or the remainder of the term for each SwyftStore (of any Ordered SwyftStores not yet installed or delivered as of the termination date)

        iii.    "<u>Monthly Fixed Install Fees</u>"
            1.    All remaining "Monthly Fixed Install Fees" for installed SwyftStores which would have otherwise been due to Swyft hereunder through the end of the Agreement Term for each SwyftStore (of any Ordered SwyftStores that have installed and delivered as of the termination date)

    c.    <u>SwyftStore Extension</u>: In the instance a SwyftStore is removed due to a landlord contract expiring, is evicted or removed by a landlord, a SwyftStore is underperforming and is requested to be removed by Brand Partner or a Brand Partner SwyftStore requires a relocation for unforeseen reasons, Swyft will extend the Initial Term at no cost to Brand Partner if Swyft is unable to relocate the SwyftStore to an approved location by Brand Partner within 30 days of the actual removal date. If the SwyftStore is uninstalled in excess of 30 days, Swyft will issue Brand Partner

    



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

==a day for day credit for Monthly Fixed Fees past the Initial Term. Brand Partner is required to pay all Monthly Fixed Fees in a timely fashion as scheduled and in order to be eligible for the SwyftStore Extension. If Brand Partner has not paid all Monthly Fixed Fees at the end of the Initial Term, Brand Partner will not qualify for the SwyftStore Extension.==

d. <u>Reasonable Efforts to Repurpose Brand Partner Machines:</u> In the event that Brand Partner chooses not to purchase hardware, Swyft will make reasonable efforts to resell, rent or lease decommissioned Brand Partner SwyftStores. Brand Partner remaining rental obligations will be offset by any resale, rent or lease amount collected by Swyft for decommissioned Brand Partner SwyftStores

e. <u>Substantiation of Rental Fees for uninstalled or unordered stores:</u> Swyft will provide Brand Partner documentation including copies of Purchase Orders, Agreements, Invoices, Remittance of Payment demonstrating expenses associated with the sourcing of Automated Store Hardware. The extent Brand Partners Rental Feel obligation for uninstalled is limited to what is verifiable.

f. <u>Early Termination for Breach</u> Notwithstanding the foregoing, a party may terminate this Agreement immediately upon written notice in the event the other party: (i) ==commits a material breach of any provision of this Agreement which is not cured within thirty (30) days of written notice from the non-breaching party (or such longer period if cure cannot be accomplished in such time period, provided that cure is promptly commenced and carried through to completion)==. In the event of a termination of this Agreement in accordance with the terms of this subsection by either party, Brand Partner shall continue to pay for the remainder of the Initial Service Term or any Renewal Term, as the case may be, ==all Monthly Fixed Fees== in a timely fashion, ==so long as neither Swyft nor its assignee take any steps to interfere with Brand Partner's access to and operation of the Swyft Stores and any equipment which is a part thereof and Swyft or its assigns take no steps to interfere with Brand partner's quiet enjoyment of the Swyft Stores, and Swyft or its assignee will use its best efforts to continue to provide all services outlined in this agreement==. In the event that Brand Partner disputes any portion of such final payment, it may pursue the remedies provided for in Section 4 above. Such dispute shall not relieve Brand Partner of its obligations to pay in full the Monthly Fixed Fees in a timely fashion.

   i. ==Service Fees in the event of Early Termination for Breach==
      1. Uninstalled or not yet ordered stores: Brand Partner is not obligated to pay Swyft or any assignee of Swyft any Service fees
      2. Installed ==Stores: If it is determined that a breach cannot be cured or has caused irreparable damage to Brand Partner, Brand Partner will file a claim for up to $19,200 per Swyft Store== as outlined below. In the event a claim is made by Brand Partner, Brand Partner is obligated to pay all Monthly Fixed Fees for the remainder of the Initial Term as set forth in this MRSA, Exhibit A, Exhibit B, any Purchase Order, Monthly Schedule or any other financial commitment Brand Partner has made to Swyft.
      3. <u>Reimbursement schedule</u>
         - Swyft will reimburse CVS for
         - Month 1-12: $19,200
         - Month 13-60: Deduct $400 per month for every month after month 12 from $19,200
         - The failure of Swyft or the inability of Swyft to make such payments shall not relieve Brand Partner of its obligations to remit payment of the Monthly Fixed Fees for the remainder of the Initial Term.

Swyft Confidential



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

g.  Termination for Insolvency:

i.  In the event of the occurrence of any of the release conditions as defined below, Brand Partner may purchase SwyftStore hardware pursuant to Section 1.b above, and, upon remittance of payment for any such purchase, terminate this agreement immediately upon written notice. In the event of any of the release conditions, Brand partner may choose not to purchase hardware, and terminate this agreement immediately upon written notice.

ii.  Escrow and Brand Partner Step In Rights. Within 30 days of the Effective Date, Swyft will deposit into a software escrow with a mutually agreed reputable technology escrow provider (the "Escrow Agent") pursuant to the escrow agreement signed by the parties and the Escrow Agent (the "Escrow Agreement") the runtime for the SwyftStore Software and the Swyft Dash software that manages the SwyftStores as well as the source code of the Swyft UX developed for the Brand Partner which Swyft represents and covenants shall, at all times during the term of this Agreement, comprise all software and materials required to operate the SwyftStores and any upgrades and updates made available by Swyft (the "Escrowed Materials"). The Escrow Agreement shall, at a minimum, provide for payment requirements and release conditions consistent with those set forth in this Agreement, and shall include representations by Swyft that the Escrowed Materials contain all components necessary to enable Brand Partner to assume responsibility for future maintenance of the Swyft UX. Swyft shall pay all the standard fees required by the Escrow Agent to establish and maintain the escrow, Brand Partner will absorb all costs of optional services except where verification of escrowed contents reveals that contents are insufficient either to the elements listed above or for Brand Partner ability to operate SwyftStores including any upgrades previously made. Failure to pay the escrow fees will result in termination of the escrow account by Escrow Agent.

iii.  If and when the Escrowed Materials are released by the Escrow Agent to Brand Partner under the escrow agreement Brand Partner will have a personal, limited, non-exclusive, non-transferable, royalty-free license (except that the license may be assigned by Brand Partner to an Affiliate to whom the License has been assigned) to use, reproduce and modify the Escrowed Materials, solely internally and only for the sole purpose of correcting software errors, fixing software bugs and/or maintaining the software

iv.  Release Conditions: The "Release Conditions" under the Escrow Agreement will be the occurrence of one or more of the following: Swyft: (1) permanently ceases to continue its business in the ordinary course without a successor through an assignment pursuant to section 18a (except where brand partner terminates for convenience); (2) files a voluntary petition in bankruptcy, consents or acquiesces to the appointment of a trustee or receiver of its property, makes a general assignment for the benefit of creditors, or admits in writing its inability to pay its debts as they become due in the ordinary course of business; or (3) becomes subject to an involuntary petition in bankruptcy or receivership which is not dismissed within sixty (60) days of such filing; or (4) Swyft fails to remit payment of amounts owed to Brand Partner for 180 days . Brand Partner acknowledges that the Escrowed Materials are Swyft' Confidential Information for all purposes of this Agreement.

v.  Ownership Rights: Swyft shall own all right, title and interest, including all Intellectual Property Rights, in and to all modifications to and derivative works of the Escrowed Materials created by or for Brand Partner, and all such modifications and derivative works shall be deemed licensed to Brand Partner as a part of the Escrowed Materials and Software. Brand Partner hereby assigns and agrees to assign all right, title and interest, including all Intellectual Property Rights, in and to such modifications and derivative works to Swyft, and shall execute all necessary instruments of assignment and undertake all other activities and cooperate in good faith as necessary to effectuate the foregoing.

vi.  Confidentiality and Restrictions: The Escrowed Materials are furnished to Brand Partner on a confidential basis for the sole and exclusive use of Brand Partner as set forth in this Section 5.d.i, and not for sale, sublicense or disclosure to third parties except to an Affiliate to whom the License has been assigned. If Brand Partner obtains the Escrowed Materials under the terms hereof, Brand Partner shall neither copy nor divulge the Escrowed Materials, or any portion thereof, during the term or after the termination of this Agreement, to any person, except during the term of this Agreement Brand Partner may disclose the Escrowed Materials to its



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

employees or agents who have agreed to maintain the confidentiality thereof and need access to the Escrowed Materials to perform their job duties for Brand Partner. Brand Partner is responsible for any misuse or unauthorized of the Escrowed Materials released to it hereunder. Brand Partner agrees to take all reasonable steps to prevent unauthorized use and disclosure of the Escrowed Materials, including, without limitation, the following: (a) the building in which Brand Partner uses the Escrowed Materials, or any portion thereof, shall have restricted access twenty-four (24) hours a day; ; (b) Brand Partner shall prevent Internet and other remote access to the Escrowed Materials from other locations; (c) the Escrowed Materials shall be installed only on a single computer system that is password protected, and (d) all Escrowed Materials files must be password protected. Brand Partner represents and warrants that Brand Partner shall enforce the terms of all non-disclosure and proprietary information inventions assignment agreements entered into with employees or agents in relation to this Section 5.d.i and shall be responsible for any breach of such non-disclosure or other agreement by such employees or agents. Brand Partner may make one copy of the Escrowed Materials solely for backup and archival purposes. Brand Partner agrees to reproduce and include all copyright and other proprietary notices appearing in or on any and all Escrowed Materials obtained by Brand Partner on any copy made by Brand Partner. Brand Partner is liable to Swyft for all direct damages resulting from any unauthorized disclosure or use of any of the Escrowed Materials. To the extent, if any, this Section 5.d.i is inconsistent or conflicts with any other provision of this Agreement, this Section 5.d.i will control. Brand Partner shall not cause or allow the Escrowed Materials to become subject to any "copyleft," open source, freeware or other similar license or distribution models.

vii. <u>Performance Bond:</u> Within 60 days of the launch of the initial 50 Brand Partner SwyftStores, Swyft will provide Brand Partner with a Performance Bond for the surety of delivering the hardware and ongoing services. The Performance Bond will be for a maximum of $200,000 and will be in effect for a period of 2 years.

viii. <u>Swyft Employee Recruiting.</u> Brand Partner may at is sole right and cost, approach Swyft employees if the Escrow Step In Right is triggered by Brand Partner. Swyft will not interrupt or stop Swyft employees from working with Brand Partner. Swyft Employees and Brand Partner will negotiate between themselves the terms of their employment or contract agreement.

ix. <u>SwyftStore Release to Brand Partner.</u> Swyft will release any and all interest and ownership of Brand Partner SwyftStores if the Escrow Step In Right is triggered by Brand Partner. Brand Partner will be liable for all remaining debt, Monthly Rental Fee, capital obligations and all residual value remaining on the SwyftStore to Swyft Capital.

1. <u>Leased or Rented SwyftStores' Removal Upon Termination.</u> Upon termination of this Agreement, if Brand Partner has elected to not purchase hardware, for points 5.a, 5.b., Swyft shall remove all leased or rented SwyftStores from their Locations and remove all Products from the removed SwyftStores. Swyft shall invoice Brand Partner for Removal Fees associated with the SwyftStores as specified in Exhibit A. Brand Partner and Swyft may mutually agree to leave stores in field upon termination.

2. <u>Survival.</u> Brand Partner's payment obligations shall survive termination of this Agreement. In addition, the following sections of this Agreement shall survive its termination: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 and 16.

6. <u>Notices.</u> Any Notice ("Notice") by either party to the other shall be made by registered or certified mail or by overnight courier service, provided that a receipt is required, and mailed to the addresses noted below, which may be changed by either party by written Notice to the other party.

To CVS:
CVS Pharmacy, Inc.
One CVS Drive
Woonsocket, Rhode Island 02895
Attention: Anna Umberto, Vice President, Strategic Procurement
Copy To: Thomas S. Moffatt, Vice President Corporate Law



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

To Swyft:
Swyft, Inc.
140 Geary St., Seventh Floor
San Francisco, CA 94108
Attention: Richard Hashim, President and COO
Copy To: Gower Smith, CEO

7. Exclusivity.

    a.    The rights and obligations of each party under this Section 7 shall apply to each party's Affiliates to the extent operating in the United States of America.

    b.    **Exclusivity Definitions**. Except as the context may otherwise require, the terms set forth below shall have the meanings indicated below:

    i.  "Branded Healthcare Concepts" shall mean a SwyftStore branded by a single brand of non-prescription pharmaceutical ), e.g. Tylenol SwyftStore, BandAid SwyftStore, Tampax SwyftStore. The only SKUs being sold in these SwyftStore would be the one brand of products.,. Private label brands of retailers (e.g. Amazon, WalMart) are not considered Branded Healthcare Concepts and are considered Competitor Swyftstores. The brand 'For Hims' is not considered a Branded Healthcare Concept.

    ii.  "Channel" refers generically to the type of locations at which the SwyftStores are located, or may in the future, be located, e.g., the Airport Channel, the Mall Channel, the Armed Forces Base Channel, the Corporate Office Channel, etc. Terms and conditions which are particular to each Channel and/or other Projects shall be set forth on successive Appendix C(s) in series (e.g., Appendix C-1,.) titled with the Channel, Project name and Terms.

    iii.  "Common Business Sense" shall mean Swyft will use its best effort and work in good faith with Brand Partner in any and all possible scenario to bring Brand Partner into a breakeven or profitable state.

    iv.  "Competitor SwyftStore" means a SwyftStore that for any brand or Restricted Retail Customer containing for sale Restricted products with more than 20% of the SKU mix comprising Restricted Products, or a SwyftStore for a National Drugstore Chain where the SKU mix contains Restricted Products with more than 5% of the SKU comprising Restricted Products. The brand 'For Hims' is not considered a Competitor Swyftstore.

    v.  "Designated Channel" is a Channel where Brand Partner agrees to scale to the maximum number of Viable Locations and where the parties mutually agree that there are at least 250 Viable Locations or brand partner places an order for 50% Planned Annual Swyftsores. If there are more SwyftStores ordered than identified Viable locations, Brand Partner may use ordered SwyftStores to fulfill this requirement, rather than placing an additional order.

    vi.  Planned Annual Swyftstores is the total count of available locations that the parties mutually agree could be sourced and contracted within the current calendar year

    vii.  "Future Client" shall mean any possible client Swyft may have or has the intention of working with.

    viii.  "Future Robotic Store" shall mean new automated SwyftStores that are different from the current SwyftStore hardware offering of R1, X2 or L1 locker automated stores. Future Robotic Stores may include variations in hardware size, product delivery and fetching, look and feel, consumer interaction points, and any other physical external or internal change that differs from the current Swyft hardware offering.

    ix.  "Location" means a physical location (such as a mall, airport or travel plaza) in which a SwyftStore is installed for operation.

                Swyft Confidential



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

x.  "National Drug Chains" shall mean those Retail companies identified on the list of Competitor SwyftStores attached as Appendix B, including Affiliates of such companies to the extent such Affiliates are operating in the United States.

xi.  "Planogram" means a specific product assortment and the physical and logical layout for such assortment.

xii.  "Restricted Products" means, non-prescription pharmaceutical, first aid and women's personal hygiene products.

xiii.  "Restricted Retail Customers" shall mean those Retail companies identified on the list of companies attached as Appendix A, including Affiliates of such companies to the extent such Affiliates are operating in the United States.

xiv.  "SwyftStore" means a self-service robotic store or vending machine being Swyft R1 or X2 automated stores or L1 locker automated stores which house products for sale and deliver such products automatically to consumers using a mechanical delivery system including future generations of such automated stores. SwyftStore excludes online parcel pickup and return lockers or optical or other self-service delivery systems that are not automated stores.

xv.  "Third Party Self-Service Store" means an automated store that is developed by any entity other than Swyft.

xvi.  "Viable Location" means a location anticipated to generate an EBIT return rate of 10% or greater. EBIT Return rate factors include a mutually agreed upon gross revenue estimate and an expense structure inclusive of: COGS, location rent, hardware fees, replenishment expense estimates, Swyft operation fees, credit card processing fee from an X2 SwyftStore. Other SwyftStore models (e.g. SwyftStore L1, Dual L1, Parcel Locker, etc.) GMS to be mutually agreed upon by Swyft and Brand Partner.

1.  **EXCLUSIVE RIGHTS GRANTED TO BRAND PARTNER.** Subject to Brand Partner maintaining at least the Minimum Mutually Agreed Number of Viable Locations for each Designated Channel, for the duration of the Initial Term;

xvii.  Subject to the exclusions in Section 7.g below, Swyft will not install, within Designated Channels in the United States, any Competitor SwyftStore or a store for a National Drugstore Chain. For clarity, Swyft may install a Competitor SwyftStore which has less than 20% of the SKU mix being Restricted Products for any customer that is not a National Drugstore Chain. If Swyft is unable to source and contract the Minimum Mutually Agreed Number of Viable Locations for a Designated Channel, providing that Brand Partner agrees to install all contracted Viable Locations that Swyft sources, then Brand Partner will retain the above-mentioned exclusive rights to that Designated Channel.

xviii.  The Brand Partner exclusivity rights set forth in subsection c.i above shall not apply in the following instances: (1) if the proposed installation by Swyft is pre-approved in writing by Brand Partner or (2) in the case where a SwyftStore was previously installed in a location, and Brand Partner has elected to remove the SwyftStore from such location.

c.  **EXCLUSIVE RIGHTS GRANTED TO SWYFT.** Within the United States and within Designated Channels, for the duration of the Initial Term, unless mutually agreed upon by Brand Partner and Swyft, Brand Partner may not install, cause to be installed, or approve the installation of a third party (non-Swyft provided) self-service robotic store or vending machine being competitive to the Swyft R1 or X2 automated stores or L1 locker automated stores which house products for sale and deliver such products automatically to consumers using a mechanical delivery system. This restriction excludes online parcel pickup and return lockers or optical or other self-service delivery systems that are not automated stores. Through the normal cadence of business Brand Partner will be presented new variations of automated stores, Future Robotic Stores and vending machine opportunities that are different from the R1, X2 or L1 locker automated stores currently offered by Swyft. In such instances Swyft will be granted the right of first refusal on a substantially similar in specifications (or better) product contingent on Swyft

Swyft Confidential



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

responding definitively within 30 days they can supply said product to Brand Partner within 12 months from the initial date of inquiry by Brand Partner.

d. **Designated Channels and Viable Locations.** The following shall be considered "Viable Locations":

    i. Airports and Transit locations are a Designated Channel which include high traffic commercial bus stations, Amtrak stations, and Subways. Data from the locations installed will determine an estimate of the potential number of Viable Locations within Airports and Transit locations. The minimum number of Viable Locations for the Airport and Transit Channel will be mutually agreed to by Sept 2019.

    ii. For the other Channels that Brand Partner has agreed to pilot in 2018 and 2019 with Swyft, Swyft agrees to provide Brand Partner with exclusivity in the pilot Channel for a period of 120 days from the date of the first installation in that Channel. Pilot Channels include; hotels/resorts, colleges, arenas, office, apartments, military, casinos, malls, hospitals, senior living, convention center, museums, and tourist.

    iii. Within the 120 days exclusivity period for a pilot Channel, Brand Partner may provide Swyft with notice of the pilot Channel becoming a Designated Channel, providing that Brand Partner issues Swyft with an order of either 250 SwyftStores, or 50% the total count of available Viable Locations that the parties mutually agree could be sourced and contracted within the current calendar year.

    iv. In Designated Channels, Swyft will not install a Swyftstore for a National Drug Chain or competing health care provider with Restricted Products where a Brand Partner SwyftStore is installed. Swyft may place a Branded Health Care Concept if placement is not within sightline or 100 ft away from Brand Partner's SwyftStore. With Brand Partner approval, Swyft may place a Branded Health Care Concept closer to Brand Partner. Swyft may place a National Drug Chain so long that the Planogram does not included any Restricted Products.

    v. In order to retain its exclusive rights per Section 7.c, Brand Partner and Swyft will mutually agree to develop an annual plan that determines the total number of viable SwyftStores that can be sourced and contracted in each Designated Channel and Brand Partner will order 50% of the total number of planned viable SwyftStores for each Designated Channel for the corresponding 12-month period. If within 90 days of the start of any calendar year, Brand Partner fails to provide an order for 50% of the planned number of viable SwyftStores for a given Designated Channel for that calendar year, then Brand Partner will lose its rights under Section 7c for that Designated Channel, however Brand partner will retain rights for all Designated Channels where Brand partner has ordered 50% or more of the planned number of viable SwyftStores for a given Designated Channel. Swyft will provide an annual plan to the Brand Partner by October 1st of the year prior to the year being planned for each designated channel. If the annual plan is not delivered to the Brand Partner by the designated date Brand Partner shall retain exclusivity rights to the designated channel for the next calendar year, regardless of the number or Swyft Stores ordered.

e. **Branded Healthcare Concepts:**

    i. If Swyft is approached by or contacts a prospect for a Branded Healthcare Concept, Brand Partner will have first right of refusal to partner with such prospect on the Branded Healthcare Concept. In the scenario where, Branded Healthcare Concept prospect does not wish to work with Brand Partner, the Branded Healthcare Concept prospect and Swyft will notify Brand Partner of this decision in writing within in thirty (30) days. Brand Partner may not interfere, disrupt or interrupt Swyft communication with such prospect in any way that could or may be interrupted as damaging, harmful or delay any communication between Swyft and the prospect. Brand Partner shall not be restricted from selling Restricted Products, any products currently being sold through Brand Partners Planogram(s) or categories of products currently being sold through Brand Partner's Planogram(s).

f. **Exclusions:**

    Swyft Confidential

DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

i. Brand Partner acknowledges that Swyft may sell Restricted Products for non-Competitor SwyftStores (where Rrestricted Products do not comprise more than 20% of SKUs) as well as shaving related products, beauty and skincare products, products sold by "For Hims",, consumable (food or beverage) products, telecommunications products, coffee products, clothing products, children toys, nutritional products including but not limited to vitamins, supplements, sports nutrition, and herbal formulas (e.g. GNC, Vitamin Shoppe, Herbalife), consumer electronics as well as other non-listed categories from SwyftStores not associated with the Brand Partner SwyftStore.

ii. Swyft may install any SwyftStore in any Designated Channel providing that it is not for a National Drugstore Chain and the Planogram does not comprise more than 20% of the SKUs being Restricted Products.

iii. Swyft may install any SwyftStore in any Channel, including a Designated Channel, where Brand Partner has not provided Swyft an order for 50% of the Planned Annual SwyftStores within the 120-day exclusivity window, as described in section 7.e.

iv. Swyft is not restricted in any way when installing a SwyftStore within the physical store, the parking or any other real estate owned or leased by a Restricted Retail Customer or National Drugstore Chain.

v. Nothing in this agreement restricts Swyft from developing, selling or licensing hardware, software or intellectual property associated with SwyftStores for a Branded Healthcare Concept. In any "Designated Channel", Brand partner will have priority in placement over any Branded Healthcare Concept – i.e. Brand Partner has first right of refusal on available locations. If Brand Partner chooses not to pursue, or the landlord will not accept Brand Partner, Swyft may place a Branded Healthcare Concept store. Brand Partner will not be restricted from entering new channels where a Branded Healthcare Concept may exist. Swyft will not place a Branded Healthcare Concept within 200 feet of Brand Partner unless mutually agreed by Swyft and Brand Partner.

vi. Swyft will not place a Competitor SwyftStore within 200 feet of Brand Partner unless mutually agreed by Swyft and Brand Partner.

8. Limitations of Liability. IN NO EVENT WILL EITHER PARTY'S LIABILITY FOR DIRECT DAMAGES EXCEED THE TOTAL AMOUNTS PAID TO SWYFT BY BRAND PARTNER UNDER THIS AGREEMENT DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE APPLICABLE CLAIM. UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, INDIRECT, OR CONSEQUENTIAL DAMAGES OF ANY KIND. THE FOREGOING LIMITATIONS SHALL NOT APPLY TO FEES PROPERLY INCURRED BY BRAND PARTNER UNDER THIS AGREEMENT, DAMAGES ARISING FROM A BREACH OF CONFIDENTIALITY UNDER THIS AGREEMENT, CLAIMS SUBJECT TO INDEMNIFICATION PURSUANT TO SECTION 11 OF THIS AGREEMENT, OR DAMAGES ARISING FROM INTENTIONAL MISCONDUCT OF A PARTY. THE FOREGOING LIMITATIONS SHALL BE ENFORCEABLE TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW.

9. Confidentiality. By virtue of this Agreement, the parties may have access to information that is confidential to the other party or its service providers, partners or vendors, including the terms and conditions of this Agreement, technical information, pricing, product designs, business and marketing plans, and business processes ("Confidential Information"). A party's Confidential Information does not include information that: (a) is or becomes generally known to the public through no act or omission of the other party; (b) was in the other party's lawful possession prior to the disclosure and had not been obtained by the other party either directly or indirectly from the disclosing party; (c) is lawfully disclosed to the other party by a third party without restriction on disclosure; or (d) is independently developed by the other party without use of or reference to the other party's Confidential Information. The parties will hold each other's Confidential Information in confidence during the term of this Agreement and for a period of three (3) years after termination of this Agreement. The parties will not make each other's Confidential Information available in

Swyft Confidential

DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

any form to any third party for any purpose except to the extent necessary to exercise its rights under this Agreement and will treat Confidential Information of the other party with the same degree of care with which it would treat its own confidential information of a like nature, and in no case with less than a reasonable degree of care. It shall not be a breach of this section if Confidential Information is disclosed pursuant to subpoena or other compulsory judicial or administrative process, provided the party served with such process promptly notifies the other party and provides reasonable assistance so that the other party may seek a protective order against public disclosure. Each party will limit the disclosure of Confidential Information to those of its employees and subcontractors who have a need to know such Confidential Information, and each party will take all reasonable steps to ensure that Confidential Information is not disclosed or distributed by its employees or subcontractors in violation of the terms of this Agreement. Neither party will use the other party's Confidential Information for any purpose other than the performance of this Agreement and shall cease all use of the other party's Confidential Information following termination of this Agreement and completion of any post-termination obligations and activities hereunder. The Parties acknowledge that the Hardware and Software embody confidential information of Swyft. Brand Partner shall not reverse-engineer, decompile, or disassemble any Hardware or Software, and shall not remove, overprint or deface any notice of copyright, trademark, logo, legend or other notice of ownership from any originals or copies of Confidential Information it obtains from Swyft. The parties acknowledge that money damages may not be a sufficient remedy for any breach of this Section 9 and that a party is entitled to seek injunctive or other equitable relief to remedy or prevent any breach or threatened breach of this Section 9. Such relief shall not be the exclusive remedy but shall be in addition to any other rights and remedies available at law or in equity.

10. Intellectual Property Rights.

    a.    All title and Intellectual Property Rights in and to the Brand Partner Content is owned exclusively by Brand Partner. Swyft is granted a non-exclusive, worldwide, royalty free right and license to use, copy, incorporate and distribute the Brand Partner Content during the Agreement Term in connection with the SwyftStores and Services and as otherwise contemplated under this Agreement with Brand Partner approval. "Brand Partner Content" means all content owned or licensed by Brand Partner and provided to Swyft in connection with the SwyftStores, including without limitation names, trademarks, service marks, logos, text, product descriptions and any content provided by Brand Partner on behalf of suppliers. "Intellectual Property Rights" means all intellectual property rights in and to any intellectual property, including but not limited to rights in and to any works of authorship, moral rights, copyrights, trademarks, patents, service marks, designs, trade secrets and algorithms.

    b.    Brand Partner acknowledges that, under this Agreement, Swyft asserts that all title and Intellectual Property Rights in and to the Swyft Technology is owned exclusively by Swyft and its suppliers, excluding only title to Hardware which passes to Brand Partner upon payment as specified in Section 1(c). "Swyft Technology" means any and all any technology, software, hardware, products, processes, algorithms, user interfaces, know-how and other trade secrets, techniques, designs, inventions and other tangible or intangible technical material or information related to the SwyftStores or utilized by Swyft in connection with the provision of the Services, whether owned by Swyft at the Effective Date or created, authored, developed, acquired, conceived or reduced to practice by Swyft after the Effective Date.

    c.    Each party agrees to recognize and respect the other party's intellectual property rights, including but not limited to, copyrights, patents, trade secrets, URLs, domains, inventions and other intellectual property rights (collectively, a party's "Intellectual Property Rights"). Each party shall

Swyft Confidential



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

protect the other party's Intellectual Property Rights, utilizing at least the same degree of care as it would utilize to protect its own Intellectual Property Rights. Except as may otherwise be specifically provided in this Agreement, no express or implied license, right or interest in or to any party's Intellectual Property Rights are granted by one party to the other, and all rights not expressly granted by one party to the other herein are retained by that party. All right, title and interest in and to all Intellectual Property Rights incorporated within the Services, including all hardware and software associated with the SwyftStores and all derivatives thereof, are owned or licensed by Swyft. Brand Partner will not, and will not allow a third party to, reverse engineer, decompile, or disassemble the SwyftStore and/or the software incorporated therein, or otherwise attempt to derive source code or other trade secrets from such software or hardware. Subject to the terms and conditions of this Agreement, Swyft hereby grants to Brand Partner an exclusive, non-transferable, royalty-free license to use the Intellectual Property Rights incorporated within the Services and all derivatives thereof solely in connection with this Agreement strictly for the use within the agreed SwyftStore concept. Swyft may use all Intellectual Property Rights incorporated within the Services, including all hardware and software associated with the SwyftStores and all derivatives with other SwyftStores. Each party agrees to allow the other party use the other's brand names, trademarks and trade styles (collectively, "Trademarks") solely in connection with the joint concepts and promotional efforts regarding the Services subject to, in each case, the prior written approval of the other party, which approval shall not be unreasonably withheld. Upon the expiration or earlier termination of this Agreement, both Parties shall immediately cease and forever refrain from using the Trademarks in any manner whatsoever and shall destroy or, at the option of a party, have the other party deliver all material in such party's possession bearing such mark.

11. Indemnification.

   a.  If any Swyft Technology becomes, or in Swyft's opinion is likely to become, the subject of a claim, demand, suit, or proceeding regarding infringement of Intellectual Property Rights, then Swyft will at its sole expense either procure for Brand Partner the right to continue using the applicable Swyft Technology or replace or modify the Swyft Technology so as to provide Brand Partner with SwyftStores functioning without material degradation in functionality. If Swyft is unable to affect the foregoing remedies after using commercially reasonable efforts, then Swyft may require Brand Partner to return the applicable Swyft Technology, in which case Swyft will refund Brand Partner the purchase price paid for the affected SwyftStores less depreciation on a straight-line basis over a seven-year period from date of installation. Swyft will have no obligations regarding any claim arising out of any modification of Hardware or Software not performed or specifically authorized in writing by Swyft.

   b.  Swyft will hold harmless and defend the Brand Partner against any claim, action, proceeding, damage, loss or expense (including attorneys fees' and cost reasonably acceptable to Brand Partner) incurred by the Brand Partner in connection with any Claim brought against Brand Partner by a third party based on (i) bodily injury, death or damage to real property or tangible personal property arising out of the gross negligence or willful misconduct of any Swyft personnel ; (ii) an act or omission of Swyft in its capacity as an employer of a person and arising out of or relating to any aspect of the employment relationship or its termination: (iii) Swyft's failure to comply with or abide by any applicable law or regulation (other than by reason of an act or omission of Brand Partner). Swyft's duty to defend Brand Partner under this Section shall apply to any complaint or claim that makes allegations that, if proved, place the alleged breach of duty, whether in tort or contractual, within the purviews of the duties, responsibilities and obligations

   Swyft Confidential

DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

undertaken by Swyft pursuant to this Agreement. For avoidance of doubt, Swyft's indemnity obligations shall not apply to the extent that any claim, damages, judgment, loss, or settlement is due to the acts or omissions of Brand Partner or its Store Brand Suppliers.

c.   Brand Partner will indemnify, hold harmless and defend Swyft against any claim, liability, damage, loss or expense (including reasonable attorneys' fees and costs) incurred by Swyft in connection with any Claims brought against Swyft by a third party relating to any Brand Partner Content, Product or services that (i) are defective, injurious, or harmful (including, without limitation, any claim for bodily injury or death); or (ii) the manufacture, sale, distribution, or use of any of Brand Partner's products or services violates the rights of any third parties or that the advertising, publicity, or promotion of Brand Partner's products or services encourages or induces the violation of the rights of any third parties

d.   The party seeking indemnity under this Section 11 ("Indemnitee") will give the other party ("Indemnitor") the following: (i) prompt written notice any Claim for which the Indemnitee intends to seek indemnity, (ii) all cooperation and assistance reasonably requested by the Indemnitor in the defense of the Claim, at the Indemnitor's sole expense, and (iii) sole control over the defense and settlement of the Claim, provided that (A) the Indemnitee may participate in the defense of the Claim at its sole expense, and (B) the Indemnitor may not, without the prior written consent of the Indemnitee, enter into a settlement to the extent such settlement restricts the business or operations of Indemnitee. The provisions of this Section shall survive the expiration or termination of this Agreement.

12.  <u>Insurance.</u> Brand Partner and Swyft shall carry their own separate policies at their own expense; products liability insurance for all Products in the amount of not less than $1,000,000 per occurrence and $2,000,000 aggregate. Brand Partner shall name Swyft as an additional insured. Swyft shall name Brand Partner as additional insured.

a.   The policies shall be underwritten by an insurance company that carries an A- or better rating from A.M. Best. Each policy (except for Worker's Compensation) shall provide that:

i.   CVS Health Corporation and its subsidiaries and affiliates shall be named as an additional insured,

ii.   no less than thirty (30) days' prior written Notice shall be given to CVS Health Corporation in the event of any alteration or terms of such policy or of the cancellation or non-renewal thereof,

iii.   such insurance (except for Worker's Compensation) will be primary insurance with respect to CVS Health Corporation and its subsidiaries and affiliates, and

iv.   Swyft will provide a Waiver of Subrogation against CVS Health Corporation and its agents, officers, directors and employees for recovery of damages against these policies.

b.   Swyft shall furnish CVS Health Corporation with a Certificate of Insurance evidencing coverage, and a Certificate of Insurance as evidence of renewal at least thirty (30) days prior to expiration of each policy. The amount of such required insurance coverage under this Section shall not limit Swyft's obligations under this Agreement

13.  <u>Compliance, Confidentiality of Data Provided and Non-Publicity</u>

Swyft Confidential



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

a.  General. The parties shall comply at their own expense with all applicable federal, state, local and foreign laws, ordinances, regulations and codes. Parties shall follow all bylaws outlined in the DATA PRIVACY AND SECURITY ADDENDUM.

b.  Confidentiality of Data Provided. Brand Partner and Swyft will maintain the confidentiality of information shared between the parties in accordance with the Mutual Non-Disclosure Agreement ("NDA") between the parties with an effective date of July 29, 2016

c.  Privacy and Security Requirements. Swyft agrees and acknowledges that it is bound by the requirements defined in the Data Privacy and Security Addendum (the "Privacy Exhibit") that is attached to the Agreement as Exhibit X and is incorporated herein by reference.

d.  Brand Partner Firewall. Swyft acknowledges that Brand Partner must maintain a firewall between the Brand Partner retail pharmacy business (the "Retail Business") and the Caremark pharmacy benefits management business (the "PBM Business") to separate certain competitively sensitive information that each business possesses. Swyft agrees that, (1) Swyft will not knowingly transfer competitively sensitive information of the Retail Business to the PBM Business or allow the PBM Business to access such information, and (2) Swyft will not knowingly transfer competitively sensitive information of the PBM Business to the Retail Business or allow the Retail Business to access such Information.

e.  Non-publicity. Swyft agrees that neither it nor any of its employees, agents, or subcontractors shall use Brand Partner's name or any photo or visual or audio facsimiles of Brand Partner's facilities or employees for any purpose. Swyft agrees that it shall not, and its employees, agents, and subcontractors shall not reveal the nature of the Services provided pursuant hereto or any details regarding the Services provided pursuant hereto to any third party for any purpose, unless prior written consent of Brand Partner has been obtained. Swyft shall not use, disseminate, disclose, or publish any work product or any other materials related to such Services in whole or part without prior written consent of Brand Partner.

f.  Consumer Data. Without limitation to subsection (a) above, Swyft shall require both third parties and Brand Partner to comply with all applicable laws, rules and regulations (collectively, "Applicable Laws") in connection with the collection, storage and use of credit or debit card information (including without limitation the Payment Card Industry Data Security Standard as amended from time to time), Transaction Data and Interaction Data (as such terms are defined below). As between the parties, Transaction Data, Interaction Data and any other information and data relating to the SwyftStores shall be owned by Swyft. Notwithstanding the foregoing, Swyft hereby agrees that it shall use the Transaction Data and Interaction Data solely for purposes of carrying out its duties hereunder, solely during the Term and solely to the extent that Swyft requires access to such data to provide the Services as contemplated by this Agreement during the Term. Swyft shall not commercially exploit the Transaction Data or Interaction Data for any other purposes or do any other thing that may in any manner adversely affect the integrity, security or confidentiality of such items, other than as specified herein or as directed by Brand Partner in writing. Swyft shall provide Brand Partner with reports regarding Transaction Data and Interaction Data with content and frequency substantially similar to that provided by Swyft to its other similarly situated partners. "Transaction Data" means the transaction information with regard to each purchase by a Consumer through a SwyftStore (such as product purchased, purchase date and purchase amount). "Interaction Data" means information related to the interaction between

   Swyft Confidential

DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

Consumers and the SwyftStore (for example, but not limited to, analytics, screen touches, abandon rate, surveys, consumer behavior and demographic data).

g.  Export. Brand Partner is advised that the SwyftStores are subject to the U.S. Export Administration Regulations, and diversion contrary to U.S. laws and regulations is prohibited. Without limitation to subsection (a) above, Brand Partner agrees not to directly or indirectly export, import or transmit the SwyftStores to any country or end user, or for any end use, that is prohibited by any applicable U.S. law or regulation (including those countries from time to time subject to embargo by the U.S. Government). Additionally, Brand Partner agrees not to directly or indirectly export, import, transmit or use the SwyftStores contrary to the laws or regulations of any other governmental entity that has jurisdiction over such export, import, transmission or use. Brand Partner represents that neither the United States Bureau of Export Administration nor any other governmental agency has suspended, revoked or denied Brand Partner's export privileges. Brand Partner agrees not to use or transfer the SwyftStores for any use relating to nuclear, chemical or biological weapons, or missile technology, unless authorized by the U.S. Government by regulation or specific written license.

h.  Management Reporting and Communications. Swyft agrees to provide Brand Partner with reports on a weekly basis or as required by Brand Partner inclusive of but not limited to General Reporting

   i.    Total hours machine is operational, and non-operational or 'downtime'
   ii.   Store Installations completed and scheduled
   iii.  Location contract and procurement updates
   iv.   Inventory Reporting
   v.    Schedule of machines to be staged with Brand Partner product, including completed
   vi.   Changes in inventory for each store (Inventory Transaction Report)
   vii.  Quantity of Brand Partner product at any third-party warehouse facility
   viii. Record of when each store was restocked, and list of items restocked
   ix.   Quantity of product received by 3rd party (report within 1 day of receipt)

i.  Quarterly KPI Review. Swyft and Brand Partner will establish, manage to Key Performance Indicator (KPI) that are reviewed quarterly reviews

   i.    Location review
   ii.   Planogram(s) review - Top selling SKU vs. low performing SKU
   iii.  Operating expenses (Daily and monthly operating expense savings and spending)
   iv.   Inventory management / replenishment
   v.    Best Practices
   vi.   A/B test results
   vii.  Key Data learnings
   viii. Financial reporting
   ix.   Vendor performance metrics
   x.    Machine uptime and service levels

14. Right to Audit

a.  Brand Partner, in its sole discretion, shall have the right, but not the obligation, to (i) audit or hire a third party auditor or (ii) allow (1) state or federal government regulators such as Center for

Swyft Confidential



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

Medicare and Medicaid Services, (2) CVS Pharmacy Benefit Management clients, or (3) accreditation agencies such as URAC, to audit any and all business and operations practices and procedures of Swyft as they pertain to this Agreement, including, but not limited to, billing practices and procedures. Brand Partner retains the right to audit the Brand Partner inventory in all Swyft automated retail stores, warehouses and third-party locations. Brand Partner will also have the right to verify /audit that all service levels agreed to in this Agreement are being met via use of an outside audit company. BRAND PARTNER or its designated agent shall perform any such audits at mutually agreed to times during regular business hours. Brand Partner shall provide prior reasonable Notice of an audit to Swyft. Following such audit, Brand Partner may provide a written report of its findings to Swyft, including a timetable for correction of any issues or problems discovered by the auditors. In the event Swyft fails to correct such issues or problems in a timely manner satisfactory to Brand Partner, this Agreement may be terminated by Brand Partner for cause in accordance with section 5 (c). Any audit shall be subject to Swyft's security and confidentiality procedures. Swyft shall be solely responsible for paying the internal costs and expenses it incurs in connection with an audit conducted under this Section along with any costs and/or expenses associated with any remediation efforts.

b.  All costs and expenses incurred by Brand Partner for such an audit will be paid by Brand Partner, unless the inspection discloses errors or omissions more than five percent (5%) of the invoiced amount in Swyft's favor in which case the costs and expenses will be paid by Swyft. In the event that an audit discloses any overcharges, the prices will be adjusted to be in accordance with the terms of this Agreement and the total amount so determined to be overcharged, at Brand Partner's option, will promptly be credited to the account of Brand Partner or paid to Brand Partner upon demand.

15. Product Supply Chain, Replenishment and Right to Re-Sell

a.  Replenishment Processes. Brand Partner Agrees to ship product needed to support program demand from its warehouses to destination points provided by Swyft at Brand Partner's expense. Destination points will consist of a combination of third-party warehouses, carrier pick up hubs or Brand Partner Store locations. Swyft is responsible for coordinating individual machine replenishment from the aforementioned destination points through a network of contracted logistics providers at Brand Partner's expense. Brand Partner and Swyft may mutually agree to improve this process

b.  Inventory Possession. Inventory remains on Brand Partner's ledger through the supply chain, until the point a sale occurs from a SwyftStore location. At the point of that transaction the inventory is sold to Swyft and all proceeds are remitted to Brand Partner minus taxes.

c.  Product Storage Standards. All Brand Partner Products shall be prepared, processed, stored, and transported under modern sanitary conditions, and by such methods that will reflect good standards of workmanship and quality in the finished product. Further, Swyft agrees they as well as contracted third-party logistics partners will store and transport Brand Partner Products in accordance with all statutes and regulations governing sanitation conditions under which products must be Stored and transported

d.  Out Dates & Damaged. Swyft commits to executing process to prevent and remove expired product that is mutually agreed upon to be effective and cost-efficient. Swyft will promptly return all designated Brand Partner product to a designated warehouse defined by Brand Partner. Brand



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

Partner agrees to cover the expense of this inspection and removal of product under replenishment Costs outlined in Exhibit A. In order to avoid outdated product, Swyft agrees implement the restocking of specific items from the back (placing new items behind items already in the machine). Brand Partner and Swyft may mutually agree to improve this process throughout the term of the contract.

e. <u>End of term.</u> At the end of the term of this Agreement or upon early termination of this Agreement, Swyft will promptly return all Brand Partner product to a designated warehouse defined by BRAND PARTNER. All cost of services and freight related to the return of Brand Partner product will be paid by Brand Partner.

f. <u>Product Recall and out of Date Product return.</u> In the event of a product recall or upon notification of the product being offered that is past the sale date, Swyft will follow procedure outline in Exhibit C. All cost of services and freight related to the return of Brand Partner product will be paid by Brand Partner.

g. Without limitation, Brand Partner shall ensure that the Products are in compliance with all other applicable federal, state and local laws and regulations and shall ensure that the Products (i) contain or reflect any legally required warnings regarding presence of any chemicals known to cause cancer or reproductive toxicity; (ii) are not adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act or any other applicable law; and (iii) are not prohibited or restricted under applicable law from being introduced into interstate commerce. As long as Swyft is Merchant of Record, Brand Partner is not liable for regulations specifically regarding sales from vending machine.

h. <u>Right to Re-Sell - Permitted Channels.</u> Within this Agreement, Swyft is limited to the resale of BRAND PARTNER products exclusively through the automated stores in the locations pre-approved by BRAND PARTNER. Under no conditions is Swyft authorized to resell BRAND PARTNER products in any other channels.

i. <u>Shrink:</u> If inventory is shown to be lost (i.e. 'shrink') in the potions of the supply chain managed by Swyft, Swyft will reimburse CVS for the value of the lost inventory. Swyft shall be liable for any product loss that occurs after acknowledgement of product receipt from Brand Partner, up until confirmation of product delivery to SwyftStore. This shall include but not limited to storage or transit by any Swyft or Swyft contracted 3rd party,

16. <u>Diverse Business Enterprise.</u> Shall mean any business located within the United States of America or U.S. territory and that is at least fifty-one percent (51%) unconditionally owned and operated by a person(s) who is either a citizen or lawful permanent resident of the United States or of a U.S. Territory and is recognized by the U.S. Government as a: Minority-Owned Business Enterprise (MBE), Woman-Owned Business Enterprise (WBE), Lesbian, Gay, Bisexual and/or Transgender Owned Business Enterprise (LGBTBE), Small Disadvantaged Business (DBE), Small Business Enterprise (SBE), Veteran-Owned Business (VBE), Service-Disabled Veteran-Owned Business (DVBE), or HUBZone Business.

17. <u>Diverse Business Enterprise Utilization.</u> In adherence to Brand Partner's commitment to supplier diversity, it is required that Brand Partner's suppliers further support the growth of Diverse Business Enterprises by the direct or indirect purchase of goods and/or services from Diverse Business Enterprises certified by one or more of the certification agencies recognized by Brand Partner. Such spend with Diverse Business



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

Enterprises will be monitored on a quarterly basis. In connection with such monitoring Swyft will be required to report to Brand Partner in its sole discretion all direct and/or indirect certified spend with Diverse Business Enterprises.

18. <u>Miscellaneous</u>. This Agreement represents the entire agreement between the parties regarding the subject matter covered in this Agreement and supersedes all prior written or oral agreements regarding the same. This Agreement may not be amended except in a written document executed by both parties. No provision of this Agreement may be waived unless done so in writing by the party providing the waiver. The parties are operating as independent contractors under this Agreement, and nothing in this Agreement will be construed as creating a partnership, franchise, joint venture, employer-employee or agency relationship. This Agreement will be governed by the laws of the State of California without regard to conflicts of law principles. This Agreement may be executed in counterparts, and signatures may be exchanged via facsimile or electronic mail.

    a. Assignment. Swyft may assign its rights but none of its obligations under the terms of this Agreement to a third party at any time without notice to Brand Partner. If Swyft does assign its rights in this Agreement to a third party, the assignee shall have all of the rights of Swyft in this Agreement but none of its obligations. Brand Partner agrees that the rights of the new owner will not be subject to any claim, defense or setoff that Brand Partner may assert against Swyft with respect to payment of the Monthly Fixed Fees. In connection therewith, Brand Partner agrees to acknowledge in writing any such assignment upon receipt of notice thereof. This Agreement may not be assigned in any manner by Brand Partner without Swyft's prior written permission; *provided, however, that either Party may, without the prior consent of the other, assign all of its rights under this Agreement to a third party participating in a merger, acquisition, sale of substantially all of the assets or other material corporate reorganization in which either Party is participating. Any attempt to assign this Agreement in violation of this provision shall be void and of no effect. This Agreement shall be binding and inures to the benefit of the Parties and their respective successors and permitted assigns.*

    b. Any assignee of Swyft which has been assigned all rights to receive payments of Rental Fees and all other payments agreed to by Brand Partner in Exhibit A may recover any such payments due and owing herein in the applicable court of law in San Francisco County, California as well as any legal fees and court costs incurred by it in collecting such fees from Brand Partner.

    c. Severability. If any provision of this Agreement or the application thereof to any persons or circumstances shall to any extent be invalid or unenforceable, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

    d. Ownership of Property. All materials, including without limitation, documents, drawings, models, sketches, designs, computer tapes and disks, and customer lists furnished to Swyft by Brand Partner or obtained by Swyft and relating to Brand Partner in connection with the Services performed hereunder shall remain the property of Brand Partner and shall be returned promptly upon completion of the assigned project or at any time upon written request of Brand Partner. Swyft agrees not to make any copies of any such materials without Brand Partner's permission and to return any copies authorized with the original materials

     Swyft Confidential



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

e.  Qualifications. All employees and independent contractors of Swyft assigned to perform the Services for Brand Partner contemplated by this Agreement shall have the requisite knowledge, expertise, and qualifications including all permits and licenses required necessary to perform such Services. Swyft, its employees, and independent contractors will perform all Services contemplated by this Agreement in compliance with applicable law.

f.  Financial Obligations. Swyft will be responsible for providing its own workers compensation, unemployment, and other coverages required by law. Furthermore, Swyft will be responsible for all taxes (including but not limited to Federal, State, local, FICA) as applicable and required by law. Notwithstanding the immediately preceding sentence, to the extent required by law, Brand Partner will withhold from payments to be made hereunder any amount required by applicable law and regulations. Swyft agrees to provide, on request of BRAND PARTNER, any information that Brand Partner may deem to be required in order to make any payments pursuant to this Agreement

g.  Business Continuity. Swyft shall have a business continuity plan in place to (i) address the loss of products, services and/or technology and third-party providers; (ii) minimize the impact of disruptions to Swyft's critical business processes and provide coordinated responses to potential or actual disruptions; and, (iii) coordinate restoration activities once a disruption has ended. Swyft shall provide a copy of its business continuity plan to CVS Health upon written request. Annually, Swyft shall assess and update its business continuity plan in light of current business and technology risks and shall attest to Brand Partner that it has assessed and updated its business continuity plan and capabilities accordingly.

h.  Compliance with Non-Discrimination and Authorization to Work Requirements. BRAND PARTNER and Swyft shall abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities and prohibit discrimination against all individuals based on their race, color, religion, sex, or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, national origin, protected veteran status or disability.

i.  Swyft agrees to post in conspicuous places, available for employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of the nondiscrimination clause.

j.  The parties incorporate into this Agreement, as applicable, the obligations regarding the notice of employee rights under federal labor laws found at 29 CFR Part 471, Appendix A to Subpart A, and Swyft will likewise incorporate those obligations into all applicable subcontracts as required by 29 CFR Part 471.

k.  Where Swyft will be providing services, deliverables or other items to BRAND PARTNER pursuant to this Agreement in connection with federal contracts or subcontracts of $100,000 or more, then BRAND PARTNER and Swyft must file VETS-100A reports by September 30 of each year, or any applicable extension deadline that VETS announces. 41 CFR Part 61-300.

l.  Swyft agrees that it will comply with all laws, regulations, and applicable executive orders governing verification of an employee's authorization to work in the United States and agrees that

           Swyft Confidential



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

it will allow only employees who are authorized to work in the United States to perform work pursuant to this Agreement.

m.  Swyft certifies that Swyft, its subcontractors and the employees of each are authorized to work in the United States pursuant to the Immigration Reform and Control Act of 1986 and that such authorization has been verified through Swyft's or Subcontractor's use of the Department of Homeland Security's E-Verify Program, or industry standard equivalent.

n.  Force Majeure. Neither party will be liable to the other for delay in performing or failure to perform any of its obligations hereunder if and to the extent that such delay or failure to perform is due to any cause beyond its control which could not have been reasonably foreseen and avoided by the exercise of due care and diligence consistent with the exercise of reasonable business judgment, including acts of God, fire, flood, explosion, wars, riots, civil disturbances, other work stoppages, court orders, governmental intervention, failures or refusal to act by government authority, and other similar occurrences. If either party is so delayed or unable to perform its obligations as a result thereof, in whole or in part, such party will promptly notify the other party thereof in writing, explaining the reason for such delay or inability to perform. In the event of such a Force Majeure, the time for performance or cure will be extended for a period equal to the duration of the Force Majeure, but in no event more than thirty (30) days. Any delayed performance not resumed after thirty (30) days will be deemed an event of default hereunder and will entitle the other party to terminate this Agreement.

o.  Debarment and Exclusion. Each party represents and warrants that neither it, nor any of its employees or agents working on its behalf and providing items and Services pursuant to this Agreement:  (i) is currently an Ineligible Person; (ii) has been charged with a criminal offense that falls within the ambit of 42 U.S.C. § 1320a-7(a) or § 1320a-7(b)(l)-(3); or (iii) has been proposed for exclusion, debarment, suspension, or other ineligibility from any Federal health care program or Federal procurement or non-procurement program. Each party further represents and warrants that if, during the term of this Agreement, it or, with respect to any of its employees or agents working on its behalf and providing items and Services pursuant to this Agreement, it has actual notice that such employee or agent: (i) becomes an Ineligible Person, (ii) is charged with a criminal offense that falls within the ambit of 42 U.S.C. § 1320a-7(a) or § 1320a-7(b)(l)-(3), or (iii) is proposed for exclusion, debarment, suspension, or other ineligibility from any Federal health care program or Federal procurement or non-procurement program, that party will immediately notify the other party, and such other party will have the right to immediately terminate this Agreement. Swyft agrees to cooperate with any requests for information by Brand Partner in order to screen Swyft's employees who are providing items and Services pursuant to this Agreement to determine if such employees are Ineligible Persons. Each party agrees to indemnify, defend, and hold harmless, the other party, its officers, directors, shareholders, employees, agents, representatives, affiliates, and assigns (the "Indemnitees") from any and all liabilities, losses, claims, damages, obligations, costs, and expenses (including, without limitation, penalties, fines, sanctions, any legal and accounting fees and expenses, any costs of litigation, investigation and settlement) that the Indemnitees may incur or suffer as a result of, arising out of, or in any way connected with (i) such party's negligence or willful act or omission of any of its obligations under this Section, or (ii) breach by such party of any of its representations and warranties contained in this Section. "Ineligible Person" means an individual or entity who: (i) is currently excluded, debarred, suspended, or otherwise ineligible to participate in the Federal health care programs or in Federal procurement or non-procurement programs; or (ii) has been convicted



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

of a criminal offense that falls within the ambit of 42 U.S.C. § 1320a-7(a), but has not yet been excluded, debarred, suspended, or otherwise declared ineligible

p. <u>Swyft Compliance with Brand Partner Ethical Standards</u>. Brand Partner requires Swyft (i) to conduct business with Brand Partner in accordance with Brand Partner's established legal and ethical standards, routines, and procedures (collectively, "Ethical Standards") and (ii) to refrain from requesting any impermissible favors, allowances, or accommodations from Brand Partner or any of its directors, officers, employees, or agents. The Ethical Standards, as may be updated by Brand Partner from time to time, in its sole discretion, can be found at www.cvssuppliers.com. Swyft, at its sole cost and expense, acknowledges and agrees that it shall, as promptly as practicable following the effective date hereof, provide a copy of the Ethical Standards (and any amendments or restatements thereof) to each of its employees, agents, and subcontractors who are responsible for either managing a www.cvssuppliers.com. account or providing products or Services to BRAND PARTNER or any affiliate of www.cvssuppliers.com., in each such case whether hereunder or otherwise.

19. <u>Exhibits</u>. Exhibit A, B, C, & D attached hereto are hereby incorporated and made a part of this Agreement.

20. <u>Appendix.</u> Appendix A, B and C attached hereto are hereby incorporated and made a part of this Agreement.

By their authorized representatives, the parties execute this Agreement as of the Effective Date.

MASTER RENTAL AND SERVICES AGREEMENT

Swyft Inc.                                    Brand Partner

By: _Richard Hashim_                          By: _Brenda Lord_

Name: Richard Hashim                          Name: Brenda Lord

Title: President                              Title: VP, Store Brands/QA CVS Health

Dated: 10/25/2018 8:35:40 AM PDT              Dated: 10/25/18

Swyft Confidential



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

**Appendix A - Restricted Retail Customers**

Walmart, Sam's Club, Kroger, Target, Sears Holdings Corporation, Costco, and successors in interest of each of the foregoing.



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

**Appendix B - National Drug Chains**

National drugstore chains, including but not limited to Walgreens and Rite Aid, with physical locations in a majority of the US states whose primary product offerings are pharmaceutical products but may also include nutritional and other products in each store ("Chain Drugstore")

Swyft Confidential



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

## Appendix C - Restricted Channels

Within the geographical area of the United States of America:

**C-1**

a.      Airports and Transit locations which include Greyhound or similar commercial bus stations, Amtrak stations, and Subways

 Swyft Confidential



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9



EXHIBIT A: "CVS" BRANDED STORES
Purchase Order

All Fees below are expressed in United States Dollars on a per-SwyftStore basis, unless otherwise noted. All "Monthly SwyftStore Rental Fees","Monthly Fixed Service Fees", "Monthly Fixed Install Fees", and "Monthly Fixed Install Fees" are due Net 30 from date of invoice. All other invoices will be issued by Swyft with payment terms for Brand Partner on all invoices being Net 30 from date of invoice.

1. **BRAND PARTNER DEPLOYMENT:**

   a. SwyftStores Scale Deployment: X2 Store Rental:

   i. Total Number of SwyftStores. 325 SwyftStores with an anticpated deployment of all SwyftStores over an estimated period of 18 months in "Monthly Installations".

   ii. Monthly Installations and Schedules. The terms of each such Monthly Installation shall be set forth in a separate monthly "Schedule" to this Purchase Order. In the event of a conflict between the terms of this Purchase Order and the terms set forth in each Schedule, the terms of the related Schedule with respect to such SwyftStores shall be controlling.

   iii. Initial Term: 60 months per SwyftStore. Initial Term for all SwyftStores in a given monthly Schedule shall commence on the first day of the month following the month of installation of the SwyftStores on such a Schedule.

   iv. Each Monthly Schedule shall include the following information:
   1. Total number of SwyftStores installed in that month.
   2. Physical installation address of each SwyftStore.
   3. "Monthly SwyftStore Rental Fees" for each SwyftStore.
      a. $259.23 per SwyftStore (X2) per Month
   4. "Monthly Fixed Service Fees" for each SwyftStore
      a. $320.00 per SwyftStore as the  "Monthly Fixed Service Fee"
      b. CVS will provide additional payment to Swyft of:
         i. $7,200.00 one-time payment per Swyftstore due upon commencement of Schedule for months 1 through 12 excluding "Pilot SwyftStores" as identified in section 1.f. of the Master Rental and Services Agreement.
   5. $200.00 per SwyftStore per month for months 13 through 60 beginning in month 13.This fee will be paid as long as Swyft fulfills obligations to brand partner. It will cease in the event of termination. It is not considerd a Monthly Fixed Fee.
   6. "Monthly Fixed Install Fees" for each SwyftStore
      a. $96.18 per SwyftStore (X2) per Month (Airports)
      b. $67.33 per SwyftStore (X2) per Month (Non-Airports)
   7. Total sum of "Monthly SwyftStore Rental Fee",  "Monthly Fixed Service Fee", and "Monthly Fixed Install Fee" herein referred to as the "Monthly Fixed Fees".
   8. Initial Term for such SwyftStores in months.
   9. The Commencement Date of the Initial Term.

Swyft Confidential



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

b. Forced Removal of SwyftStore: ==If it is determined that Swyft or one of Swyft service providers is at fault and this has caused a landlord to request the removal of a SwyftStore, Swyft will be 100% responsible for the removal costs of the SwyftStore. If a SwyftStore is removed and not redeployed within 30 days, Swyft will credit Brand Partner for the Monthly Fixed Fee for the SwyftStore by extending the duration of that SwyftStore's Service Period by adding the number of whole months that the SwyftStore was in storage.== Brand Partner and Swyft will use their best endeavors to redeploy removed SwyftStores to avoid having removed SwyftStores in storage.

c. Annual Bonus

i. In addition to the rental fees outlined in section b.ii. above, CVS will pay Swyft $20,000 annually for every 50 machines that are averaging 10% or greater EBIT per month for the months installed of the calendar year. Stores must have been installed for at least three months to be eligible.

d. Brand Partner shall have 15 business days in the next succeeding month to issue a written notice of acceptance or rejection of the installations scheduled for the preceding month. If written notice is not received by the 15th business day following the go live date, installation is automatically deemed accepted.

e. For the first month a SwyftStore is installed Brand Partner will be invoiced a pro-rata amount for the Monthly Fixed Fee based on the number of days the SwyftStore is installed as a percentage of the number of days in the month. Such amount will be invoiced with the Monthly Variable Service Fee and any Pass-Through Fees and will be payable Net 30 from date of invoice.

f. Invoicing Terms

i. Brand Partner to pay the Monthly Fixed Fee set forth above for Term set forth in each Schedule of SwyftStores.

ii. Monthly Variable Service Fee: (invoiced monthly after the end of the month). Fees are based on X2 hardware: CVS will pay Swyft the difference of whichever is higher 23.5% of 'Net Revenue' per month, per SwyftStore or The Monthly Fixed Service Fee of $600. Net Revenue is defined as total sales less monthly Replenishment Fees and Monthly Rent expense. Monthly Replenishment fees and Monthly Rent expenses are defined below. Such fees are in addition to the Monthly Fixed Fee.

iii. Pass-Through Fees: invoices to be paid net 30 from invoice date

iv. Invoices to be paid net 30 from invoice date for Monthly Rental Fees and net 30 for all other invoices, unless otherwise noted.

v. Invoices will incur an amount equal to the greater of $25.00 or 5% interest for every 30 days, or portion of 30 days, past due.

vi. Invoices will be billed monthly for the Monthly Fixed Fee and billed recurring for the term of that tranche of Monthly Installations. The term will be based on the first day of the month following the installation month. In order to reduce administration costs and simplify billing schedules, any partial days will be invoiced separately and not counted towards the service period for purposes of calculating term.

2. **Pass-Through Fees:**

**Pass –Through Fees are fees associated with the operation of client SwyftStores, where Swyft provides services to manage certain services on behalf of its clients and passes the cost on to**



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

**the client. These fees are typically invoiced at cost therefore Brand Partner agrees to pay Swyft on the same terms as offered to Swyft by its supplier or location partner such that Swyft is not required to finance such fees. Typically Pass-Through fees are invoiced monthly in arrears unless otherwise specified below. Fixed location rents and location deposit amounts will be invoiced by Swyft in advance such that Swyft can pay its partner amounts when due.**

a. <u>Location Fees.</u> Amounts equal to Swyft's actual out-of-pocket expenses for (i) Monthly Rent (including percentage rent and fees) payable to landlords and/or third parties who control or manage locations for the SwyftStores, (ii) rent deposit payable to landlords for the SwyftStores (iii) governmental or administrative licenses, permits or certificates that Swyft is required to obtain in connection with a Location and (iv) penalties imposed on Swyft by landlords due to a shortage of inventory that is attributable to Brand Partner or its suppliers (v) Rent is invoiced under the same payment terms as negotiated with the landlord. (vi) Brand Partner to have final approval of all locations, (vii) at the end of all location leaseses, all deposits will be returned to Brand Partner within 30 days of Swyft receiving the deposit from the landlord.

b. <u>Unique Site Preparation Fees.</u> Amounts equal to Swyft's actual out-of-pocket expenses associated with unique site preparation required at a Location, such as special construction or additional electrical circuits or network connections. Such fees will be quoted to Brand Partner, and approved by Brand Partner, prior to Swyft incurring the same.

c. <u>All Machine Movement Fees.</u> When a SwyftStore is relocated, the service fees are paused for the period while the SwyftStore is inoperable and in-transit.

d. <u>Custom Brand Fixture.</u> All amounts paid by Swyft to third-party vendors for design, manufacturing and shipping of Aesthetics, Signage and LCD monitors.

e. <u>Custom Features.</u> Fees and expenses associated with any other unique features of the Brand Partner Sold by Swyft- branded SwyftStores requested by Brand Partner and agreed to by Swyft.

f. <u>Planogram Changes.</u> - Third Party Servicer and Other Costs. Amounts equal to Swyft's actual out-of-pocket expenses associated with fees paid to third party servicers for Planogram changes, as well as part and merchandising shipping costs and the costs of any hardware changes associated with the changes.

g. <u>Taxes.</u> For the avoidance of doubt all pricing stated in this MDF Authorization Form does not include applicable Taxes. Brand Partner is responsible for any and all Taxes imposed by any government authority and based on the value or amount of SwyftStores sold/leased or licensed under this Agreement or the Services provided under this Agreement, with the exception of any taxes based on the net income of Swyft.

h. <u>Replenishment Fee.</u> Amounts equal to Swyft's actual out-of-pocket expenses for Services relating to inventory replenishment of the SwyftStores rendered for each SwyftStore location. Swyft to send projected on going replenishment cost to Brand partner for each proposed location. Brand Partner to approve and sign off of on all projected replenishment costs.



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

i.  FLS Fee. Amounts equal to Swyft's actual out-of-pocket expenses for Services relating to first-line onsite technical servicing (FLS) of the SwyftStores rendered for each SwyftStore location. FLS shall consist of minor repairs and troubleshooting not involving a replacement part, a warranty claim, a manufacture defect, or a malfunction of Swyft software, machine firmware, or machine hardware that is not caused by an end user or external event. Brand Partner FLS may consist of but are not limited to machine re-boot, damage to the machine caused by an end user, reconnecting power if unplugged, re-configuring modems for changes in telecommunication signal reception and other non machine warranty parts or machine defect issues not caused by Swyft.

j.  Product Miss-Vends. Up to $35 per month, per SwyftStore will be passed through to CVS. All cost in excess of $35 will be paid by Swyft.

k.  Shrink. Any Products that Swyft or Swyft third parties deem not be suitable for placement in Store due to being damaged, opened, defective, expired code date, or otherwise shall be shipped back to Brand Partner and replaced by Brand Partner. When products are in custody of Swyft or a Swyft contracted 3rd party, until they have been stocked into a SwyftStore, Swyft is responsible for shrink. Swyft or Swyft contracted 3rd party shall confirm product receipt within 24 hours. Brand partner and Swyft will mutually agree on any discrepancies reported within 24 hours. Swyft will be liable for any discrepancies reported after 24 hours unless Brand Partner agrees to take responsibility.

l.  Property Tax. Property tax, if any, imposed by the landlord at each location. For example, property tax may range from as low as $60 annually to greater than $400. Property tax varies by state and jurisdiction.

m.  **Capitalized Terms. All capitalized terms used herein and not herein defined shall have the meanings set forth in the Master Rental and Services Agreement (the "Agreement"). The Agreement shall be controlling in the event there is a conflict between the terms of this Order and the Agreement.**

n.  Payment Processing: Any and all base and variable fees associated with the sale of Products imposed by Swyfts' credit card merchant. Payment processing contractual agreement will be presented to CVS prior to launch of first SwyftStore:

    i.   Original sale of Product
    ii.  Chargeback on fraudulent payments - Swyft to share all Fraud Tools in place
    iii. Returns of products by consumers under Brand Partner's returns policy
    iv.  Swyft will commit to working with Brand Partner to execute agreed upon best practices

for PCI compliance

3. **Fees Paid by Swyft.**



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

a. <u>Fees for Audience Measurement Solutions.</u> Monthly Fees associated with costs incurred by Swyfts' for software license costs (not including but not limited to cameras, camera installations, supporting hardware (if any)) in connection with audience measurement solutions.

b. <u>Service Calls:</u> During the contract period following the date of installation of the first SwyftStores hereunder, Swyft shall be responsible for the intake of all calls from Consumers regarding the SwyftStores and the Products. Swyft shall handle any calls regarding technical issues on the SwyftStores, such as miss-vends, absence of receipt, inquiries regarding credit card charges on non-dispensed items (collectively, "Technical Issues"). All calls regarding Products, including Returns, shall be forwarded to Brand Partner for handling.

c. <u>Network Connectivity.</u> Amounts equal to Swyfts' actual out-of- pocket expenses associated with activation and monthly fees for network connectivity.

d. <u>Network Monitoring and Technical Support:</u> Ongoing monitoring, warranty and servicing of the SwyftStore.

e. <mark><u>Location Procurement.</u> Ongoing support and cost to secure, negotiate and maintain Brand Partner locations.</mark>

f. <u>Brand Partner SwyftStore Network development and management.</u> All costs associated with managing, developing and overseeing Brand Partner's complete SwyftStore Network as outlined in Exhibit B.

g. <mark><u>Late fees associated with administration of pass through expenses.</u> Any fees assessed that are the result of a late payment administration from Swyft, that is not the fault of the Brand Partner, shall be paid by Swyft.</mark>

h. <mark><u>Penalties for machine downtime</u> Any fees or penalties imposed by host sites due to machine downtime or malfunction are to be paid by Swyft</mark>

4. <u>**Swyft Optional Merchant Of Record Services and Reconciliation Process.**</u>

Where it is mutually agreed that Swyft will act as the Merchant of Record for Brand Partner, Brand Partner will consign inventory. Where Swyft is Merchant of Record and goods are consigned then <mark>Swyft will remit funds for products sold weekly on a schedule required by Brand Partner.</mark>
Reconciliation of funds to Brand Partner

a. Swyft will hold all proceeds from sale of products in a dedicated Merchant Account and from the merchant account.

b. Swyft will provide daily sales data in a format, method, and timing agreed upon by Brand Partner

<mark>Swyft will remit payment weekly to Brand Partner on Mondays, 1 week in arrears.</mark> Payment is submitted via ACH to a bank account of Brand Partner designation, for the sum of total sales. Swyft will provide via sFTP a settlement file containing detail of all transactions in the pay period.. Tax will be withheld by Swyft Brand Partner will have the right to audit payments and reconciliation files at any time.



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

    i.   For clarity, Swyft will provide payment on Monday for the week ending 9 days prior (1 week in arrears)

    c.   Swyft will invoice CVS monthly for credit card processing fees.

    d.   Continued failure to meet these standards including agreed date of delivery and accuracy may result in withholding on invoices due to Swyft not covered under the finance agreement.

    e.   If payment is not made an interest charge of 5% for every 30 days, or portion of 30 days, past due.

    f.   Swyft will provide final payment and settlement files for all unprocess sales withing 14 calendar days of implanting above payment procedures

## Effective Date.

The effective date of this Agreement shall be the date on which it is countersigned by Brand Partner as indicated below; provided, however, that such signature must occur no later than October 25, 2018.

By their authorized representatives, the parties execute this Agreement as of the Effective Date.

### EXHIBIT A: "CVS" BRANDED STORES

Swyft Inc.

By: *Richard Hashim*
DocuSigned by:
—C1F15129FB6C45E...

Name: Richard Hashim

Title: President

Dated: 10/25/2018 8:35:40 AM PDT

Brand Partner

By: *Brenda Loral*

Name: Brenda Loral

Title: VP, Store Brands
CVS Health

Dated: 10/25/18

    Swyft Confidential     swyft

DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

**swyft**

## EXHIBIT B - SERVICES

1.  <u>Swyft Services</u>. Swyft and its third parties will provide the following Services.

    a.  <u>Development of Brand Partner SwyftStore.</u> Swyft will develop a Brand Partner SwyftStore which will include a customized graphical user interface utilizing standard user interface templates from Swyft ("UX"), and a customized product assortment for the Products ("Planogram"). The Brand Partner SwyftStore will also include the development of the Brand Partner aesthetics (i.e., the branding structure and/or graphics surrounding the outside of a SwyftStore) ("Aesthetics") and Brand Partner Signage ("Signage"), in each case based on digital content, artwork and/or graphics to be chosen by Swyft and Brand Partner and provided to Swyft in a format specified by Swyft and meeting its standard co-branding requirements attached as Attachment B-1. Swyft shall identify and coordinate with one or more third-party vendors for the design, manufacturing, and shipping of the Aesthetics and Signage, and Brand Partner shall be responsible for reimbursing Swyft for associated fees paid by Swyft to such third-party vendors.

        i.  Brand Partner and Swyft to meet in person or by phone monthly, to review performance, sales strategy, roll out schedule, sales/promotions, relocation of installed SwyftStores, and overall business operations.

    b.  <u>Number of Planogram changes.</u>

        i.  Brand Partner shall be entitled to four (4) major planogram changes a year for every defined channel that is scaled. A Major planogram is defined as when a shelf or a single divider is moved.  Scaling is defined in section X from the date of the first install. One (1) planogram change may be performed per quarter, with a max of four (4) planogram changes a year. Field service costs for planogram changes such as third-party costs for reconfiguring hardware or changing machine graphics are passed through to Brand Partner.  Swyft will use its best commercial efforts to support Brand Partner on all minor planogram adjustments and changes outside of a planned planogram change.

        ii.  Major Planogram Changes not planned for during the aforementioned 12-month period shall be forfeited. No additional Planogram Changes, UX Touches or development hours will be included in place of these forfeited Planogram Changes.

        iii.  In the event a location requests specific adjustment to a base planogram Swyft and the Brand Partner agree to review on a case by case basis. Brand Partner will be subject to fees outlined below in section 1.b.vi.

        iv.  Additional Planogram Changes and/or UX Touches may be available upon Brand Partner's request for an additional charge. Rates for additional work outlined below:
            1.  Single SKU testing: $100 per SKU, up until Swyft implements capability to automate testing and at that time Swyft and Brand Partner will review new cost structure.
            2.  Set up of new POG based on existing tested SKUs: $500
            3.  New UX touches or changes: $150/hr.
            4.  Complete UX rebuild or overhaul will be quoted per occurrence

    c.  <u>Shipping and Installation.</u> Upon completion, Swyft will ship and install the SwyftStores to the agreed upon locations.

Swyft Confidential

DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

d.   Integration with Swyft's Network. Swyft will establish the Swyft cloud network set-up and configuration incorporating all the Brand Partner data with SKU setup, Swyft machine integration, and reporting dashboards.

e.   Network Monitoring and Technical Support. Swyft will monitor the availability and proper functioning of the SwyftStores, and troubleshoot any downtime or technical issues as needed and in accordance with the Swyft Service Levels as set forth in Attachment B-2. Costs of any replacement parts for Hardware shall be borne by Swyft.  For avoidance of doubt, Swyft shall warranty all parts and labor cost for the contract length on all hardware. Brand Partner shall bear the cost of any replacement parts and labor for Hardware that is vandalized or abused. Any labor involved with replacement parts and/or other second-line technical support issues requiring a physical dispatch to a SwyftStore, shall be covered under the Monthly Service Fees so long as (i) the Service Term for the SwyftStore remains in effect, (ii) the SwyftStore is located within the United States or within an approved Swyft servicing area outside of the United States and (iii) none of the Exclusions set forth in Section 1(c) of the Master Purchase and Services Agreement are applicable to the support issue.

f.   Location Sourcing and Procurement.

i.   Swyft shall present proposed Locations to Brand Partner for its written approval (which may be given via email), which approval shall not be unreasonably withheld or delayed. Brand Partner shall provide its approval or denial of a location within five (5) business days of receiving the information on such Location from Swyft. Swyft will provide all relevant location information including location placement with floorplan, foot traffic estimates, all location site fees, location contract information, proposed replenishment provider and cost, product restrictions, necessary business license costs, property tax to be assessed (if known).

ii.   Swyft will enter into lease agreements directly with the lessors of such locations and shall pay applicable fees directly to such lessors. Only Swyft may enter into lease agreements for Locations.

iii.   In the event a Location is not profitable for Brand Partner, Brand Partner may request that Swyft attempt to identify a new Location for the SwyftStore. In the event Swyft is able to find a new Location, then Brand Partner may request that Swyft relocate the SwyftStore to the new Location, provided that Brand Partner shall be responsible for paying all costs associated with the relocation, including any logistics or shipping costs incurred by Swyft as well as any early termination fees that may apply to the Location from which the SwyftStore is being moved from.

iv.   Every month Swyft will analyze roll out schedule and strategy in effort to grow network.

g.   Inventory Management. Swyft will provide Brand Partner with data on all inventory movements including quantity on hand at third party facilities, confirmation of receipt of product, movement between third party facilities, and replenishment orders to allow Brand Partner to monitor inventory levels and generate replenishment orders for transfer from distribution centers to SwyftStores. Swyft together with the Brand Partners will be responsible for determining the SwyftStore stocking and replenishment strategy.



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

h.  Reporting. Swyft will provide sales reports to Brand Partners on a schedule requested by Brand Partner and agreed to by Swyft.  As new reports are created these will also be provided to Brand Partners.  Swyft agrees to provide all reports to Brand Partner that it provides to other brand clients of Swyft.

i.  Brand Partner content. Manage all Brand Partner digital and static content on the SwyftStore, Swyft Website and Swyft mobile App for Brand Partner SwyftStores only.

j.  Marketing Development. Swyft will help to market and advertise the Products for Brand Partner.

k.  Inventory/Sales Information. Swyft will be providing sell through and inventory information for all SwyftStores.

l.  Product Returns. Defective product returns. Returns of defective products will be returned to a location designated by CVS if product is identified as defective while in the supply chain. All product questions and returns post sale from SwyftStore are handled by Brand Partner.

m.  Merchant of Record. Swyft shall be merchant of record ("MOR") for all Products sold through the SwyftStores. As MOR, Swyft shall (i) utilize only Swyft approved payment authorization company, (ii) be responsible for all payment processing, fees and chargebacks, and (iii) be responsible for the collection and the payment of any and all state and local sales and use taxes, gross receipts, business and occupation taxes, or value added taxes incurred or required to be collected or paid for any reason in connection with the sale of Products from the SwyftStores.

2.  Brand Partner Obligations:

a.  Marketing. Brand Partner shall provide marketing support and resources in support of the SwyftStores. Brand Partner to approve all marketing or PR material. When referring to Swyft Hardware (SwyftStores) in Digital, Print or other marketing collateral, the Brand Partner shall embed the approved Swyft Logo, or Swyft Intelligence Logo in such a way the Brand Partner deems appropriate.

b.  Aesthetics, Fixture and Signage. Brand Partner shall be responsible for providing the digital content, artwork and graphics for the Aesthetics and Signage as described in Section (A)(1) above.

3.  Effective Date. The effective date of this Agreement shall be the date on which it is countersigned by Brand Partner as indicated below; provided, however, that such signature must occur no later than 7 days of receipt of the proposal.

4.  Controlling Agreement. In the event that there is any conflict between the terms of this agreement and the terms of the Master Rental and Services Agreement (the "Agreement"), the terms of the Agreement shall be controlling.



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

## ATTACHMENT B-1 - SWYFT BRANDING

During the Term of the Agreement and following its termination, the SwyftStores shall bear the following Swyft branding.

As consistent with Swyft's historical practices for Brand Partner and other customers:

1. About Swyft. The Swyft logo will appear in the SwyftStore's user interface, and will be accompanied by a short explainer "About Swyft".
2. Customer service. Customer service decals, receipts and internal store identification plates will contain Swyft branding, and up to 2% of each user interface or multimedia screen may contain Swyft branding.
3. Manufacturer's decal. A "Manufacturer's Decal" bearing the Swyft logo shall appear on the bottom left of the front exterior of the machine. The Manufacturer's Decal will be no smaller than 4 inches wide, unless at Swyft's discretion.
4. Intelligence decal. An "Intelligence Decal" bearing the Swyft logo shall appear below the camera and above the touchscreen on the front exterior of the machine. The Intelligence Decal will be no smaller than 2.5 inches wide, unless at Swyft's discretion.
5. MOR requirements. In the nature of transparency for the consumer, and to comply with Visa & MasterCard's requirements, if Swyft is MOR then Swyft must clearly be represented to the consumer as the MOR. Among other things, this typically means inclusion of:
   a. A large Swyft logo on the exterior of the store viewable from 20 feet away
   b. A more significant section in the user interface that explains Swyft
   c. The logo, customer support information and policies on all receipts
   d. Swyft branded customer support stickers/decals on the SwyftStore



DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

## ATTACHMENT B-2 - SERVICE LEVELS

1. <u>Technical Support.</u> The Swyft Call Center operates seven days a week, twenty-four hours per day. Brand Partner may contact the Call Center regarding support issues and questions via a toll-free telephone number. In addition, Swyft's in-field technicians respond to service requests (including requests automatically generated by the SwyftStores' internal monitoring systems) seven days a week between the hours of 8:30 a.m. – 9:00 p.m. in the time zone in which each SwyftStore is located, excluding local national holidays ("Dispatch Hours"). In-field service requests that are received after 6:00 p.m. may be responded to the following day for response. Support issues are handled in accordance with the Severity Level schedule set forth below:

| Severity Level & Description | Response Time (*) |
|---|---|
| **Severity 1**<br>Issue with machine or network that is preventing machine from selling product | 4 Hours |
| **Severity 2**<br>Sales can be processed, but issue with machine or network that is impacting sales velocity | 6 Hours |
| **Severity 3**<br>Issue with machine or network that is not impacting sales velocity | Dependent on issue |

(*) During Dispatch Hours. Measured from time Swyft becomes aware of issue upon a service ticket being generated.

2. <u>SwyftStore Uptime SLA.</u> At such time as Brand Partner has deployed at least fifteen (15) SwyftStores, Swyft will provide Brand Partner with a monthly report showing Brand Partner Network Uptime for such month. "Brand Partner Network Uptime" means the percentage of time during the month, as averaged across all of Brand Partner's SwyftStores, that the SwyftStores were capable of generating revenue, i.e., were not experiencing a Severity 1 issue.

3. <u>Credits.</u> For any quarter in which Brand Partner Network Uptime is less than 98.5%, Swyft shall, as it sole obligation and Brand Partner's sole remedy for downtime, rebate back to Brand Partner as follows: Swyft's Monthly Fixed Service Fee for the percentage of downtime below 98.5% uptime. Any rebates paid to Brand Partner shall automatically be remitted to Brand Partner by Swyft in the next calendar month.

By their authorized representatives, the parties execute this Agreement as of the Effective Date.

Swyft Inc.

By: _Richard Hashim_
C1F15129FB6C45E...

Name: Richard Hashim

Title: President

Dated: 10/25/2018 8:35:40 AM PDT

Brand Partner

By: _Brenola Lord_

Name: Brenola Lord

Title: VP, Store Brands CVSHealth

Dated: 10/25/18

Swyft Confidential

**swyft**

DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9



<u>EXHIBIT C: "CVS" Product Recall Process: Internal</u>

**Scope**

Occasionally CVS Pharmacy will issue a recall on a specific product contained in one or many of the automated retail stores. This requires the immediate suspension of the impacted stores' capability to dispense this item, and the stock of the product to be removed from the store(s) and returned to the Swyft's 3PL warehouse. The product is quarantined at the warehouse before being sent to the product's supplier's location, which CVS representatives will provide.

<u>CVS Representatives (CVS)</u>
**Chad Edwards:** Chad.Edwards@cvshealth.com, 978-835-4755
**Matt Tamke:** Matthew.Tamke@cvshealth.com, 401-787-3948

**Process**

1) CVS will notify Swyft Client Services (Ben Deller, Ben.Deller@SwyftStore.com, 415-490-6789) via a telephone call or via email within 1 hour of receipt of recall initiation. CVS is also able to contact the below Swyft contacts under the circumstances that Ben
   Deller is not reached immediately:

   − Jordan Smith - jordans@swyftstore.com - 415-500-1667
   − Lora Magallanes - loram@swyftstore.com - 510-409-3118
   − Mabel Xaba - mabelx@swyftstore.com - 603-727-2645

   CVS will provide the following information in the initial product recall communication:
   a) Name of product recalled [Provided by QA]
   b) SKU # of product recalled [Provided by QA]
   c) Requested date that the product must be physically removed from the impacted stores [Provided by QA]
   d) List of impacted stores [Provided by Chad & Matt]
   e) Reason for product recall [Provided by QA]

2) Swyft Client Services will immediately contact Software Support and instruct them to remove the identified item from the User Interface (UI). Once removed from the UI customers will no longer be able to purchase the product from the store.

3) Swyft Client Services will notify CVS via email that the identified item has been successfully removed from the UI (as directed).
   a) During Regular Business Hours - 8:30AM to 5:30PM PST - 2 HOUR RESPONSE TIME to have product removed from UI
   b) During outside of Regular Business Hours - 5:30PM to 8:30AM PST - 5 HOUR RESPONSE TIME to have product removed from UI

4) Swyft Client Services will submit a PRF (Project Request Form) to the Swyft Operations Team to commence the physical removal of recalled product from the stores.

5) The Swyft Operations Team will submit a plan to Client Services that includes process, timeline, and budget for removal of the identified recalled items.

6) Once the project is approved, the Swyft Operations Team will implement the project plan with Swyft Field Service Providers to remove the item from the automated stores. This will be executed within 1 week of the initial recall notification.

   The onsite process for a service provider may slightly differ each time, depending on if they need to pick up a new product to replace the recalled product, if any hardware need to be slightly adjusted, and if there are any other items that need to be addressed during the visit.

7) When the recalled products are removed from stores by an employee of Swyft's 3PL firm, they will be returned to the 3PL warehouse facility and received into a locked quarantine area. When all product has been removed from all impacted stores,

DocuSign Envelope ID: 5D8939F5-7270-4C84-9927-F68B56DE37B9

the total number of items quarantined will be confirmed with Swyft Operations Team, CVS.

8) Once the recalled product is received quarantined at the 3PL warehouse, the Swyft Client Services Manager will confirm with CVS the plan to ship the recalled product to the product supplier within 2 weeks of the recall initiation. CVS will provide Swyft's Client Services Manager with the address product will be shipped to, the recalled SKU # and item description, and the Return Authorization Number (RA #). The 3Pl firm will place a shipping label in each box of recalled product containing the quantity of item (in that box), the SKU #, the item description, and the RA #.

9) The assigned Swyft Project Manager will report progress throughout the process and upon completion. A summary of the final pass-on costs will be sent by the Swyft Project Manager to CVS outlining budgeted vs actual costs. Pass on costs may include (but are not limited to) labor, transportation, and shipping.

Signed _____ Richard Hashim _____

DocuSigned by:
C1F15129FB6C45E...

Richard Hashim
President and COO
Swyft Inc.

*Swyft Confidential*                    swyft

DocuSign Envelope ID: EA8092A5-BB73-4DDF-9455-33A356728F7A

# Amendment To Master Rental and Services Agreement

## Between

## CVS Pharmacy, Inc.

## And

## Swyft Capital

This Amendment dated _____10/11/2023_____ (the "Amendment") amends the Master Rental and Services Agreement effective October 25, 2018 (the "Agreement") by and between CVS Pharmacy, Inc., a Rhode Island corporation, on its own behalf and on behalf of its Subsidiaries and Affiliates, including without limitation Caremark Rx, L.L.C., with an office located at One CVS Drive, Woonsocket, RI 02895 ("CVS") and Swyft Capital, a Delaware corporation having its principal place of business at 166 Geary St, Floor 15, San Francisco CA 94108 ("Swyft").

WHEREAS, the parties mutually desire to amend the Agreement;

NOW, THEREFORE, in consideration of the mutual premises of this Amendment and the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

This Amendment will be effective as of ___10/11/2023___.

The parties agree that the terms of this Amendment will prevail to the extent they conflict with any terms of the Agreement.

All terms and conditions of the Agreement shall remain unchanged and in full force and effect except as noted below:

1. Notwithstanding anything to the contrary in the Agreement, in any Equipment Schedule, or in any Purchase Order, the costs associated with inventory replenishment shall not be charged to Brand Partner as Pass-Through Fees. In lieu of recovery through Pass-Through Fees, Brand Partner shall pay to Swyft a fee for replenishment that shall be fixed to 10.6% of gross monthly sales ("GMS") in the deployed SwyftStores that are located in all US major metropolitan cities. Swyft shall be responsible for all replenishment fees in excess of that fixed proportion, except where CVS provides prior written approval.

2. Notwithstanding anything to the contrary in the Agreement, in any Equipment Schedule, or in any Purchase Order, the costs associated with Warehouse, Overpacking and Storage Fees shall not be charged to Brand Partner as Pass-Through Fees. In lieu of recovery through Pass-Through Fees, Brand Partner shall pay to Swyft an amount of Warehouse and Storage Fees, including any that are Pass-Through Fees, that will be fixed to 5% of GMS in the deployed SwyftStores.

3. Notwithstanding anything to the contrary in the Agreement, in any Equipment Schedule, or in any Purchase Order, Monthly Location Fees charged by Swyft to Brand Partner for SwyftStores acquired pursuant to Equipment Schedule 13 placed in airports shall be calculated as the greater of six hundred dollars ($600) or fifteen percent (15%) of monthly GMS each month. For purposes of clarification, the



DocuSign Envelope ID: EA8092A5-BB73-4DDF-9455-33A356728F7A

foregoing applies exclusively to Equipment Schedule 13, Equipment Schedules 1 – 12 will retain their existing payment schedules.

4. Notwithstanding anything to the contrary in the Agreement, in any Equipment Schedule, or in any Purchase Order, Monthly Fees charged by Swyft to Brand Partner for Amenity Placements of SwyftStores acquired pursuant to Schedule 13 shall be calculated as the sum of three hundred dollars ($300) + 17.5   % of monthly fee that CVS collects from the customer (net of any share with the customer, where applicable), where an "Amenity Placement" is one in which the SwyftStore was deployed to a location for which no location rent is due to the landlord/customer. For purposes of clarification, the foregoing applies exclusively to Equipment Schedule 13, Equipment Schedules 1 – 12 will retain their existing payment schedules.

5. Notwithstanding anything to the contrary in the Agreement, in any Equipment Schedule, or in any Purchase Order, Location Fees charged by Swyft to Brand Partner for placements of SwyftStores acquired pursuant to Equipment Schedule 13 in which the SwyftStore was deployed to a location originally identified by Brand Partner, its affiliates or employees ("CVS-Sourced Placements") shall be set as follows:

   a. Three hundred dollars ($300) with no rev share, any vertical, where the CVS-Sourced Placement is one made at a location that is not owned or leased by CVS or its affiliates.
   b. No monthly fee, with no rev share, any vertical, where the CVS-Sourced Placement is one made at a location that is owned or leased by CVS or its affiliates.
   c. For purposes of clarification, the foregoing applies exclusively to Equipment Schedule 13, Equipment Schedules 1 – 12 will retain their existing payment schedules

6. Notwithstanding anything to the contrary in the Agreement, in any Equipment Schedule, or in any Purchase Order, Monthly Location Fees charged by Swyft to Brand Partner for all other SwyftStore placements pursuant to Equipment Schedule13 (excluding those covered in the three previous paragraphs) shall be calculated as the greater of three hundred dollars ($300) or fifteen percent (15%) of GMS  each month. For purposes of clarification, the foregoing applies exclusively to Equipment Schedule 13 ,    Equipment Schedules 1 – 12 will retain their existing payment schedules.

7. CVS finances only 1 year of service fees at the time of install. For avoidance of doubt, the parties hereby agree that, notwithstanding anything to the contrary in the Agreement, in any Equipment Schedule, or in any Purchase Order, Swyft shall not be permitted to obtain financing of the Total Fixed Fees in connection with any Equipment Schedule or SwyftStore for more than twelve (12) months' worth pro rata of the Total Fixed Fees for that Equipment Schedule or Purchase Order, excluding anticipated payments for hardware or installation. For purposes of clarification, the foregoing apply exclusively to Equipment Schedule 13. Equipment Schedules 1 – 12 will retain their existing payment schedules.

8. The parties do hereby agree and acknowledge that Purchase Order 01     shall be the last Purchase Order issued pursuant to the Agreement, and no new deployments shall be made pursuant to Purchase Order 01 or the Agreement. Future deployments of new SwyftStores shall be made only pursuant to a new Master Agreement, and shall only occur if at least ninety-five percent (95%) of the SwyftStores that have been acquired under any Equipment Schedule pursuant to this Agreement are actively deployed and functional.

9. The parties do hereby amend Section 2 of the Agreement, by appending the following:



DocuSign Envelope ID: EA8092A5-BB73-4DDF-9455-33A356728F7A

2.    Third Party Service Providers

a.    The parties may mutually    agree that certain services associated with the SwyftStores ("Direct Third Party Services") may be obtained by Brand Partner directly from certain third parties, as outlined below ("Direct Third Party Service Providers"). Brand Partner may    deal directly with the Direct Third Party Service Providers, and shall be solely responsible for paying Direct Third Party Service Providers for Direct Third Party Services that have been ordered by Brand Partner. Swyft will only bill Brand Partner as Pass-Through Fees expenses for services that Swyft itself has ordered from any party that is also a Direct Third Party Service Provider. As of April 1, 2023, the list of Direct Third Party Service Providers includes the following:

•    SSN: Responsible for Warehousing of product inventory; storage of idle SwyftStores; site surveys, installations and removals

10. Notwithstanding anything to the contrary in the Agreement, in any Equipment Schedule, or in any Purchase Order, the costs associated with removal and redeployment of any SwyftStore that is removed from a location less than one year after initial placement in that location shall be the sole responsibility of Swyft and shall not be charged to Brand Partner, unless a reason for removal is related to unavailability of inventory SKUs by CVS.

11. The parties do hereby amend Attachment B-2 of the Agreement by appending the following: "Active SwyftStores SLA. Swyft shall ensure that at least ninety-five percent (95%) of the of the SwyftStores that have been acquired under any Equipment Schedule pursuant to this Agreement are actively deployed and functional and shall report performance relative to this standard to Brand Partner monthly." To enforce the Swyft fees referenced in paragraphs 1 & 2, CVS agrees to provide inventory sufficient to maintain 95% in-stock.

12. Swyft agrees to provide CVS with the right of first refusal, with sixty (60) days' notice, enabling CVS to purchase the SwyftStores on any Equipment Schedule at end of term for that Equipment Schedule.

IN WITNESS WHEREOF, the parties hereunto have executed this Amendment to the Agreement, effective as of the effective date above.

| **CVS Pharmacy, Inc.** | **Swyft Capital** |
|---|---|
| By: _Michael Wier (signature)_ | By: _Gower Smith (signature)_ <br> —7DBD3D83A2D142E… |
| Name: Michael Wier | Name: Gower Smith |
| Title: VP Store Brands | Title: President & CoFounder |
| Date: 10/24/2023 | Date: 10/11/2023 |

**Service Agreement Amendment**
**_Privileged & Confidential_**
_Do not copy or distribute without prior written consent by CVS_
Rev.9.18.13



# EXHIBIT "B"

BDJ\99999\859255.1

# SETTLEMENT AGREEMENT AND LIMITED RELEASE OF CLAIMS

This Settlement Agreement and Limited Release of Claims (this "Settlement Agreement") is entered into with an Effective Date of the 17th day of October, 2022 (the "Effective Date"), by and between CVS Pharmacy, Inc., on its own behalf and on behalf of its subsidiaries and affiliates ("CVS"), a Rhode Island corporation having an address at One CVS Drive, Woonsocket, Rhode Island 02895, and Swyft, Inc., on its own behalf and on behalf of its subsidiaries and affiliates, including Swyft Capital (collectively, "Swyft"), a Delaware corporation having an address at 1763 Timothy Drive, San Leandro, CA 94577. CVS and Swyft (each a "Party") are together referred to herein as the "Parties".

## RECITALS

WHEREAS, CVS and Swyft entered into a Master Rental and Services Agreement ("Agreement") effective October 25, 2018, pursuant to which Swyft rented automated retail machines to CVS for the sale of its goods and was obligated to handle all ongoing operations of said machines (the "Services");

WHEREAS, CVS alleged that Swyft breached the Agreement by failing to pay CVS T-Log payments required by the Agreement for periods up to and including September 24, 2022 ("T-Log Dispute");

WHEREAS, CVS also conducted an audit and alleged that it overpaid Swyft for certain services through December 31, 2020 ("Audit Dispute");

WHEREAS, CVS demanded from Swyft payment of the T-Log funds and reimbursement of overpayments in the Audit Dispute;

WHEREAS, Swyft alleged that CVS owes it certain funds under the Agreement for periods up to and including October 17, 2022, and

WHEREAS, the Parties desire to settle any and all disputes regarding the alleged funds Swyft owes CVS for T-Log payments and under the Audit and all alleged funds CVS owes Swyft under the Agreement, inclusive of related costs, without the admission of liability or fault, in accordance with the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the above Recitals, the mutual covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1. Settlement Payment. Swyft agrees to pay CVS the sum of one million eight hundred thousand dollars and zero cents ($1,800,000.00) in full satisfaction of the T-Log Dispute and Audit Dispute (the "Settlement Payment"). Swyft agrees to pay CVS $600,000 of the Settlement Payment within 7 days of Swyft closing its Series A-2 round (scheduled for December

1

23, 2022)   . If the first Settlement Payment of $600,000 is not made by January 4, 2023, Section 2 penalties will be triggered and Swyft shall owe the entirety of the Settlement Payment by January 4, 2023. Beginning January 2023, Swyft will pay the remaining $1.2 million in equal monthly installments of $33,333 by the fifth day of each month, with Swyft's last monthly payment to be paid by March 5, 2024. Swyft shall then pay the remainder of the balance due and owing on April 5, 2024. All payments will be made via the normal ACH process the Parties currently use.

2.      Remedies for Late Payments. Swyft agrees that CVS is entitled to specific remedies for nonpayment or late payments of any or all payments listed in Section 1 above. If any Settlement Payment is not paid on or before the date it is due, Swyft agrees that the full remaining amount of the $1.8 million Settlement Payment is due and shall be paid to CVS within five (5) days of the default. Additionally, daily compound interest in the amount of .05% on the full amount owing shall accrue until the date it is paid. CVS shall not be required to send Swyft notice of default for this Section to take effect.

3.      No Fine or Penalty. The Parties agree that no part of any payments made pursuant to this Settlement Agreement constitutes (i) a fine or penalty under any law or (ii) a payment to settle any actual or potential liability for a fine or penalty under any law.

4.      Replacement    of Agreement.     The Parties agree that the Master Rental and Services Agreement, effective October 25, 2018, and all Amendments thereto, will be replaced by a new Agreement effective on or before April 1, 2023. The Parties will work in good faith to negotiate the new Agreement for execution on or before April 1, 2023. If the Parties cannot execute a new Agreement by this date, the terms of the Master Rental and Services Agreement, inclusive of all Amendments, will terminate. The termination of the Agreement has no impact on this Settlement Agreement or on Swyft's payment obligations hereunder.

5.      Limited Release of Claims by CVS. CVS, on behalf of itself and its officers, directors, shareholders, principals, affiliates, employees, subsidiaries, agents, parents, predecessors, successors and assigns (the "CVS RELEASORS"), hereby fully and forever releases and discharges Swyft, together with its officers, members, managers, directors, shareholders, principals, affiliates, employees, subsidiaries, agents, parents, predecessors, successors and assigns (the "SWYFT RELEASEES"), from any and all manner of claims, actions, causes of action, suits, debts, expenses, sums of money, accounts, covenants, contracts, controversies, agreements, promises, damages, judgments and demands whatsoever, whether known or unknown, claimed or suspected, fixed or contingent, accrued or unaccrued, in law or at equity that CVS RELEASORS now have, have ever had, have ever claimed to have had, or may have against SWYFT RELEASEES, arising out of or related to the T-Log Dispute or Audit Dispute from the beginning of the world until the Effective Date. CVS covenants and agrees not to assert any claim or initiate any legal or other action against Swyft with respect to any matter covered by the foregoing release. Provided however, that this Release does not cover any claims that have arisen or may arise between the parties related to any third-party product liability claims or the Parties' ability to seek indemnification, whether under state or federal statute or principle of common law, arising from any third-party claim(s) arising from the Services or related equipment provided by Swyft. CVS acknowledges and agrees that if it should hereafter assert any claim or demand or commence or

2

threaten to commence any action, claim or proceeding otherwise prohibited by this Settlement Agreement, this paragraph may be raised as a complete bar to any such action, claim or proceeding.

6.     Limited Release of Claims by Swyft. Swyft, on behalf of itself and its officers, directors, shareholders, principals, affiliates, employees, subsidiaries, agents, parents, predecessors, successors and assigns (the "SWYFT RELEASORS"), hereby fully and forever releases and discharges CVS, together with its officers, members, managers, directors, shareholders, principals, affiliates, employees, subsidiaries, agents, parents, predecessors, successors and assigns (the "CVS RELEASEES"), from any and all manner of claims, actions, causes of action, suits, debts, expenses, sums of money, accounts, covenants, contracts, controversies, agreements, promises, damages, judgments and demands whatsoever, whether known or unknown, claimed or suspected, fixed or contingent, accrued or unaccrued, in law or at equity that SWIFT RELEASORS now have, have ever had, have ever claimed to have had, or may have against CVS RELEASEES, arising out of or related to the T-Log Dispute, Audit Dispute, or any alleged funds owed by CVS under the Agreement, from the beginning of the world to the Effective Date. Swyft covenants and agrees not to assert any claim or initiate any legal or other action against CVS with respect to any matter covered by the foregoing release. Provided however, that this Release does not cover any claims that have arisen or may arise between the parties related to any third-party product liability claims or the Parties' ability to seek indemnification, whether under state or federal statute or principle of common law, arising from any third-party claim(s) arising from the Services or related equipment provided by Swyft. Swyft acknowledges and agrees that if it should hereafter assert any claim or demand or commence or threaten to commence any action, claim or proceeding otherwise prohibited by this Settlement Agreement, this paragraph may be raised as a complete bar to any such action, claim or proceeding.

7.     Confidentiality. Each Party hereto agrees to keep confidential and to not disclose the terms of this Settlement Agreement or the content of the negotiations associated herewith (the "Confidential Information"). The above restrictions shall not apply to Confidential Information (i) after such time as it becomes a matter of public record through no act, omission or fault of either Party hereto in breach of these obligations; or (ii) that either Party hereto is legally required to disclose by statute, regulation or legal process, including pursuant to a subpoena or similar document. The Parties agree that, notwithstanding the foregoing, the Parties may disclose the terms of this Settlement Agreement as necessary to their tax preparers, regulators, and/or attorneys on a confidential basis. CVS may also disclose the amount of the Settlement Payment to the company that performed the Audit on a confidential basis. The Parties hereto agree to use best efforts to immediately notify the other Party as soon as the first Party becomes aware of the possibility that disclosure of Confidential Information may be required in connection with a legal proceeding.

8.     No Acknowledgement of Fault. The Parties agree that this Settlement Agreement is the compromise of disputed claims and agree that nothing in this Settlement Agreement shall be construed as an admission of any fault or liability by either party.

9.     Entire Agreement. This Settlement Agreement represents the entire agreement between the Parties with respect to its subject matter and supersedes all prior negotiations or agreements between the Parties, either written or oral, in connection with the subject matter of this

3

Settlement Agreement. Notwithstanding anything contained herein to the contrary, the Parties acknowledge that the release contained in paragraphs 5 and 6 above shall in no way affect any Party's rights to enforce the terms of this Settlement Agreement. Nothing in this Settlement Agreement terminates, waives, or otherwise alters any provisions of any other contracts or agreements between the parties, unless expressly stated herein.

10. Choice of Law. All disputes arising under or relating to this Settlement Agreement shall be governed by, and the terms of this Settlement Agreement shall be construed and interpreted in accordance with, the laws of the State of New York.

11. Counterparts. This Settlement Agreement may be executed in counterparts with the same effect as if all Parties hereto had signed the same document.

12. Miscellaneous. This Settlement Agreement is binding on the Parties and their respective successors and assigns. The invalidity of any covenant, restriction, condition, limitation or any other part or provision of this Settlement Agreement shall not impair or affect in any manner the validity, enforceability or effect of the remainder thereof, and such provision, or portion thereof, shall be construed so as to be lawful and enforceable to the greatest extent allowed by law. Each person executing this Settlement Agreement on behalf of an organization represents and warrants that he or she is fully authorized to execute and deliver this Settlement Agreement on behalf of such organization. The Parties represent and warrant that they each have voluntarily signed this Settlement Agreement after having the opportunity to consult with counsel and as their free act and deed, and with full knowledge and understanding of the terms of this Settlement Agreement. No Party hereto, nor any attorney of any Party, shall be deemed the drafter of this Settlement Agreement for the purposes of interpreting or construing any of its provisions, and no rule of construction resolving any ambiguity against the drafting party shall be applicable to this Settlement Agreement.

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement and Limited Release of Claims as of the Effective Date.

SWYFT, INC.
By: _____
Name: Mike Carpenter
Title CFO
Duly Authorized:

CVS PHARMACY, INC.
By: _____
Name: Thomas S. Moffatt
Title: VP & Secretary
Duly Authorized

SWYFT CAPITAL
By: _____
Name: Mike Carpenter
Title: CFO
Duly Authorized

4